1

DIA FORM 388 (2-7) DIA - AGENT REPORT

| DEFENSE INTELLIGENCE AGENCY - AGENT REPORT | |
|---|---|
| **SUBJECT(s):**<br>NAME: MORTER, John S.; CIV/USSOCOM<br>DPOB: ▮▮▮<br>SSN: ▮▮▮ | **DATE:**<br>3 August 2012 |
| | **FILE NUMBER(s):**<br>File No. 10-1003416<br>CCN: 12-300-44 |
| **REPORT PREPARED BY:**<br>▮▮▮ Special Agent | **SIGNATURE**<br>▮▮▮ |

-----SUMMARY OF INFORMATION-----

**BACKGROUND**
DAC5 (DIA Credibility Assessment Program) notified the DIA Investigations Division Mr. John S. Morter, hereafter referred to as SUBJECT, was unable to successfully complete HIS counterintelligence scope polygraph (CSP) administered by DIA in Tampa, Florida on 31 January 2012. The 31 January 2012 CSP was a continuation of polygraph testing initiated in March 2011.

**COORDINATION WITH US SPECIAL OPERATIONS COMMAND (USSOCOM)**
On 8 June 2012, the Reporting Agent contacted Mr. Frank Branch, Special Security Officer (SSO), USSOCOM, and requested he coordinate with SUBJECT to determine HIS availability for travel to the Washington, DC area for interview and continued polygraph testing.

On 14 June 2012, the Reporting Agent coordinated, via email, with Mr. ▮▮▮ Deputy SSO, USSOCOM, and scheduled SUBJECT for interview at 0900, 26 June 2012. Mr. ▮▮▮ related he would pass the information to SUBJECT and schedule HIS TDY.

On 15 June 2012, Mr. ▮▮▮ contacted Reporting Agent via email and forwarded a document prepared by SUBJECT in which HE detailed HIS concerns relating to a question asked during the conduct of the CSP pertaining to the mishandling of classified material.

**SUBJECT INTERVIEW**
At 1125, 26 June 2012, SUBJECT was provided and signed a DIA Privacy Act and Interview Advisement (**EXHIBIT 1**) and was interviewed by the Reporting Agent and Investigator (INV) ▮▮▮ in Room S170, Defense Intelligence Agency Headquarters (DIAH), Joint Base Anacostia-Bolling (JBAB), Washington D.C. regarding HIS inability to successfully complete HIS aperiodic counterintelligence scope polygraph examination.

SUBJECT related HE had retired from active duty with the United States Air Force circa 2001 and became a Department of the Air Force civilian employee assigned to US Special Operations Command after military retirement. SUBJECT became a DIA COCOM employee in 2008 when DIA absorbed the Combatant Commands' (COCOM) civilian employees under the JIC/JAC MIP Implementation Study (JMIS). SUBJECT claimed HE had submitted and successfully completed polygraph examinations when HE was an active duty

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

PRIVACY ACT - 1974 (AS AMENDED) applies - This report may contain information which must be protected IAW DOD 5400.11-R, and it is for official use only (FOUO)

AGENCY EXHIBIT P 1

member of the United States Air Force in the 1980's and 1990's administered by the Air Force Office of Special Investigations (AFOSI).

SUBJECT related HE became very anxious when the polygraph examiner asked HIM questions relating to mishandling of classified material. SUBEJCT was shown a copy of the document provided by Mr. ▓▓▓▓ **(EXHIBIT 2)** on 15 June 2012 and confirmed HE authored the document detailing HIS concerns regarding mishandling of classified material. SUBJECT explained HE was uncomfortable with the process in which information copied to CD-Rom/flash drives from JWICS was labeled (classified or unclassified) during HIS time with USSOCOM. SUBJECT related the process for moving information between JWICS, SIPRNet, and NIPRNet had been refined and HE was now confident in the process and information being copied to external storage devices was now properly labeled.

The Reporting Agent provided SUBJECT numerous examples of "intentionally mishandling classified information" and SUBJECT maintained HE had never intentionally mishandled classified material for nefarious reasons or with the intent to do harm to national security. SUBJECT was provided the opportunity to divulge any information/concerns HE had concerning the issue of mishandling classified material and did not disclose any reportable information. SUBJECT claimed HIS provided written letter detailed HIS concerns.

SUBJECT claimed, since HIS initial DIA administered CSP in March 2011, HE had made a conscious effort to report all unofficial foreign contacts. SUBJECT related HIS spouse's (also a DIA contract employee, employed by US Central Command, USCENTCOM, in Tampa, FL) job duties included being a liaison officer between the US Coalition Countries operating at CENTCOM and CENTCOM. As such, HE had been invited to numerous official functions in which HE had contact with foreign nationals belonging to the Coalition Forces. SUBJECT adamantly denied HE disclosed classified material to any of the foreign nationals HE met at HIS wife's official functions and stated HE had completed unofficial foreign contact reports on all persons encountered during the functions. SUBJECT claimed HE completed the unofficial foreign contact reports in "hardcopy" and provided them to HIS SSO at USSOCOM. SUBJECT was provided the opportunity to disclose any additional unreported unofficial foreign contacts and denied HE had any.

SUBEJCT was provided the opportunity to disclose any other information or issues, related or unrelated to mishandling classified or foreign contacts, HE felt may be inhibiting HIS ability to successfully complete HIS CSP and denied HE had any unreported information or concerns.

At 0900, 27 June 2012, the Reporting Agent and Investigator ▓▓▓▓ reminded SUBJECT of the provisions of the DIA Privacy Act and interviewed SUBJECT regarding HIS inability to successfully complete HIS counterintelligence scope polygraph examination administered on 26 June 2012. SUBJECT rendered a voluntary sworn written statement **(EXHIIBT 3)** in which HE denied mishandling classified information, having disclosed classified information to unauthorized person(s), or having unreported foreign contacts.

**POLYGRAPH**
On 9 March 2012, the Reporting Agent coordinated with Ms. ▓▓▓▓ DIA Credibility Assessment Program and obtained copies of polygraph reports pertaining to SUBJECT, dated 23 March 2011 **(EXHIBIT 4)**, 25 March 2011 **(EXHIBIT 5)**, and 31 January 2012 **(EXHIBIT 6)**. The reports reflected SUBJECT successfully completed portions of the polygraph examination pertaining to espionage, terrorism, and sabotage, however, was unable to successfully complete portions relating to mishandling classified material and foreign contacts.

### UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVACY ACT - 1974 (AS AMENDED) applies - This report may contain information which must be protected IAW DOD 5400.11-R, and it is for official use only (FOUO)

On 15 June 2012, the Reporting Agent provided a copy of SUBJECT's written memorandum detailing HIS concern relating to questions regarding mishandling classified material to Ms. ▓ and Mr. ▓ Polygraph Examiner, DIA Credibility Assessment Program for their review.

At 1445, 26 June 2012, Ms. ▓ notified the Reporting Agent SUBJECT was unable to successfully complete HIS DIA administered CSP, in particular the topic relating to "Mishandling Classified Material." A copy of the polygraph report prepared by Mr. ▓ was provided (**EXHIBIT 7**). Ms. ▓ further related, unless SUBJECT provided reportable information during subsequent interview conducted by the DIA Investigations Division, no further polygraph testing was anticipated.

### LAW ENFORCEMENT RECORDS CHECK
On 25 July 2012, a check of the Defense Central Index of Investigations (DCII) determined SUBJECT was identified as being associated with Air Force Office of Special Investigations (AFOSI) File Number 8604D467-638.

On 2 August 2012, the Reporting Agent coordinated with SA ▓ Chief Counterintelligence Functional Desk, AFOSI, Quantico, VA and determined the DCII check referenced a successfully completed AFOSI counterintelligence scope polygraph examination conducted circa 1986, prior to AFOSI computer tracking systems.

### TERMINATION OF INVESTIGATION
On 3 August 2012, the Reporting Agent coordinated with Supervisory Special Agent ▓ Washington DC Field Branch, DIA Investigations Division, who opined, based on SUBJECT's failure to provide additional reportable information that would warrant further polygraph testing, this investigation should be closed in the files of this office.

**STATUS**: This is a Final Report.

### EXHIBITS
1) DIA Privacy Act and Interview Advisement, dated 26 June 2012
2) Memorandum authored by SUBJECT, 15 June 2012
3) Voluntary Sworn Statement rendered by SUBJECT, dated 27 June 2012
4) DIA Polygraph Report, dated 23 March 2011
5) DIA Polygraph Report, dated 25 March 2011
6) DIA Polygraph Report, dated 31 January 2012
7) DIA Polygraph Report, dated 26 June 2012

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**
PRIVACY ACT - 1974 (AS AMENDED) applies - This report may contain information which must be protected IAW DOD 5400.11-R, and it is for official use only (FOUO)

**AGENCY EXHIBIT P 3**

 

**DEFENSE INTELLIGENCE AGENCY**
WASHINGTON, D.C. 20340-5100

You are to be interviewed by an authorized representative of the Defense Intelligence Agency (DIA). The Privacy Act of 1974 and other applicable Federal laws and regulations require that you be informed of the following items before the interview begins.

_JSM_ **AUTHORITY**: DIA is authorized to administer DoD security programs and policies under its charter, DoD Directive 5105.21, "Defense Intelligence Agency." We obtain information in order to ensure compliance with:
Executive Order 10450, "Security Requirements for Government Employment"
Executive Order 10865, "Safeguarding Classified Information Within Industry"
Executive Order 13526, "Classified National Security Information"
DoD Directive 5210.8, "Policy on Investigation and Clearance of DoD Personnel for Access to Classified Information"
Office of the Director of National Intelligence, Intelligence Community Directive Number 704, "Personnel Security Standards and Procedures Governing Eligibility for Access To Sensitive Compartmented Information And other Controlled Access Program Information"

_JSM_ **PRINCIPLE PURPOSE**: This interview is being conducted to obtain information which will assist DIA officials in making security determinations concerning employment or retention in DIA civilian positions or assignment to DIA of Armed Forces personnel, access to classified information by DIA civilian or military personnel or DIA contractors or consultants, and other security-related personnel management decisions.

_JSM_ **ROUTINE USE**: The information you provide will be used with other investigative information to determine suitability for employment or assignment at DIA and eligibility for access to classified information. This information may be disclosed to other Federal agencies charged with making similar decisions or conducting authorized investigations or otherwise disclosed as prescribed by law.

_JSM_ **DISCLOSURE**: This is a voluntary interview. Accordingly you do not have to answer questions. No disciplinary action will be taken against you solely for failing to answer questions. Any statements you furnish may be used in any future criminal proceedings, administrative or disciplinary proceedings.

_JSM_ **FAILURE TO PROVIDE THE REQUESTED INFORMATION**: Although you are not required to answer questions or provide information, you should be advised that failure to provide all or part of the information requested or providing false information may result in non-selection for employment or assignment to DIA, reassignment; assignment to less sensitive duties, denial of access to classified information, denial of entry into controlled access areas, or even termination of employment with DIA.

| Name | Signature | Date |
|---|---|---|
| [signature] | JOHN S. MORETZ | 6/26/2012 |

EXHIBIT ___1___ CCN _12-___

**AGENCY EXHIBIT P 4**

1404/ 15 JUN 2012

My concerns with the question – 'have you ever intentionally mishandled classified information?'

1. Approximately 30-40% of my duties involve the transfer of classified data in support of national-level intelligence requirements, Special Operations planning and support to the war fighter. Because we use systems on both SIPRnet and JWICS, we are constantly moving data back and forth between them. This is accomplished via removable hard drive, DVD/CD and sometimes floppy disk. Usually, imagery and other data is acquired on the JWICS and moved down to the SIPRnet or standalone workstation for processing, and then moved back up to the JWICS for dissemination. Occasionally, some files are required to be downloaded from the JWICS only to disseminate on the SIPRnet. Another aspect is that some of our workstations are stand-alone and not connected to a network. As far as I know, they've never been officially designated as classified, but we use classified information on them, so we've internally designated them as classified – at one time several years ago as Top Secret, then more recently as Secret. Confusion usually arises as to what we should classify the removable media taken from these machines, ultimately developing in to feelings of inappropriate behavior. At one point we've heard that it's okay to mark a CD Secret if it only contains Secret data, but was taken from the JWICS. Then later we find out that it should have been marked Top Secret. We've also been instructed to document each and every file that is moved down from JWICS on a spreadsheet for accountability purposes. This spreadsheet currently consists of thousands and thousands of files. Although I have diligently tried to keep up with this list, due to overwhelming circumstances, I cannot state with a clear conscience that every single file that has been moved down has made it to the list. As a side note, we have never been required to provide this list to anyone.

2. Over the course of the last 12 years, we have been authorized to move data in this way, and then told to stop (BUCKSHOT YANKEE), and then told it was okay. Often times there were grey areas where we weren't exactly sure what we were doing was officially authorized, but in the interest of supporting the war fighter, we went ahead and moved the data. In the early 2000's, we were even told that we had an 'exception to policy' that authorized us to move classified data via removable media. Although I had never seen this 'exception to policy', I often felt that have been in some way circumventing the approved methods. Later, I was directed to self study for the Information Transfer Authority (ITA) test. The way this test worked was that you had to score at least 90% and you could only take it three times – the third failure would result in denial of the


EXHIBIT CCN
AGENCY EXHIBIT P 5

authority. After falling short on the first two attempts, I decided that I would put off taking the test for the third time for as long as possible. This decision allowed us to continue transferring data without interruption for at least another few weeks. After being contacted by the Information Assurance Office on several occasions that they would have to lock down our machines if we weren't ITA certified, I studied intensely, took the test for the third time and finally passed.

3. Throughout the history of this office, we have been required to burn CDs/DVDs/floppy disks from either JWICS or SIPRnet and label them according to their contents. Up until about a year ago, this was accepted practice – depending on who you listened to. Some people would say it was fine, while others said that the removable media should be labeled with the level of classification of the system it came from. I was always uncomfortable with this practice and would always do it in trepidation. Now, according to SOCOM regulations, we have permission to create a disk with the classification of the system it was taken from, but not allowed to create and label a disk with a lower classification than the system it was taken from. Instead, a form 14 and an ECR is required before J6 representatives will perform the procedure for the requestor.

4. To help remedy these types of problems and address potential areas of concern to conscionable workers like me, SOCOM JICSOC leaders have directed J6 computer support personnel to create a workstation that has all the necessary applications on the JWICS. Although this would seem like an easy task, we have been waiting for over two years for the workstations to come online. In the meantime, we continue to transfer classified data back and forth between the domains adhering to current security requirements. Even when/if this gets accomplished, we will still face the dilemma of transferring down to SIPRnet for dissemination to the war fighter.

John S. Morter, GS-13
HQ USSOCOM, J2-JIC-GEOINT

# Voluntary Sworn Statement

Date: 27 June 2012
Case Number: 12-300-44
Name: MORTER, John S.
SSN: ██████
Organization: DIA, USSOCOM

**VOLUNTARY SWORN STATEMENT:**
___JM___ I have been advised of the provisions of the DIA Privacy Act and wish to render the following voluntary sworn statement:

My whole problem began during the first poly that I took in March 2011. At that time, when I was asked the question "have you ever intentionally mishandled classified information?" I was worried about the instances that I have already provided in another letter. The polygrapher did not help me work through the question at all and I was called back the following day for more. Since then, I have been asked this question over and over, literally hundreds of times. I have nightmares about being interrogated and have fretted over the this situation for months.

I have conducted considerable research on the subject and talked with dozens of people about the subject in order to determine why I am having trouble passing the poly. As a result, I have concluded that I have worked myself in to a situation where every time I am asked the question in an intensive environment such as being connected to the poly machinery, I worry that I will not be able to remain calm enough and I panic, producing a false positive.

After 32 years in the intelligence business without a single security violation, undergoing five SSBI investigations where my coworkers, my bosses, even my neighbors were questioned about my trustworthiness, it comes down to my inability to remain calm under pressure.

Compounding this whole dilemma is that my wife has already been judged by this process as a liar and not trustworthy. As a result, her SCI was revoked and she lost her livelihood. If this could happen to her, I know that it could happen to me as well. I have found myself in an extremely unfortunate situation that there appears to be no way out of.

Q: ██████
A: MORTER
Q: Have you intentionally mishandled classified information?
A: No.
Q: Have you intentionally mishandled classified information with the intent to do harm to US National Security?
A: No.
Q: Have you disclosed classified material to any person(s) unauthorized to have access to classified information?



EXHIBIT _____  CCN _____   PAGE 1 of 3
AGENCY EXHIBIT P 7

STATEMENT OF: JOHN S. MORTER, SSN: [redacted]   DATED: 27 JUN 2012, CONTINUED:

A: No.
Q: Have you disclosed classified material to any person(s) that did not have a "need to know" the information?
A: No.
Q: Do you have any unofficial unreported foreign contacts?
A: No. All my foreign contacts have been reported to the SSO at USSOCOM.
Q: Have you researched the polygraph examination or polygraph procedures on the internet or elsewhere?
A: Yes. Extensively. I read a book, searched the internet, and saw movies. I learned how the polygraph works. I was looking at physiological conditions that may inhibit a person from passing the test. I did not specifically look for information on how to "beat the polygraph" however did come across some articles that discussed that topic. I read the articles but did not take any credence in them and did not feel they would help my situation.
Q: Did you deliberately attempt to alter you normal physiology during the course of your polygraph examinations?
A: No. I was just focused on trying to remain calm. I was afraid to attempt anything that would appear as if I was trying to influence the test. That would have just compounded my problem.
Q: Is there anything else you have not disclosed relating to mishandling classified material and/or unauthorized foreign contacts?
A: No. I previously provided the memorandum detailing my concerns about mishandling.
Q: Is there anything else you have not disclosed you feel may be inhibiting your ability to successfully complete your polygraph examination?
A: No. There is nothing else. I am just dwelling on everything involved in this process. I guess I am just not reacting well under pressure. The fear of failure is overwhelming.
Q: Is there anything you wish to add to this statement?
A: I tend to over think things and stress over things.
Q: Is there anything else you wish to add to this statement?
A: No.///END OF STATEMENT///

NOT USED

PAGE 2 of 3

AGENCY EXHIBIT P 8

STATEMENT OF: JOHN S. MORTER, SSN: ███████   DATED: 27 JUN 2012, CONTINUED:

NOT USED: *Jm*

"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."

Signature of Person Making Statement

DATE/TIME 27 JUN 12 / 1050

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 27 day of JUN 2012,
at DIA HQ, WASH DC
(Location)         (Day)         (Month, Year)

Auth: Derived from Article 136, UCMJ, 10 U.S.C. 936, and 5 U.S.C. 303

**ADMINISTERING OFFICER:**

███████████████████
Signature of Person Administering Oath

███████████████████
Name/Organization of Person
Administering Oath

**WITNESS:**

███████████████████
Signature of Witness

███████████████████
Name of Witness

_____
Name of Organization

DD Form 2824, OCT 2000                                    Page___of___

EXHIBIT ___3___   AGENCY EXHIBIT P 9