UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN S. MORTER,

    Plaintiff,

v.

LLOYD AUSTIN,
Secretary of Defense,

    Defendant.

Civil Action No. 23-0343 (JEB)

**PLAINTIFF'S STATEMENT OF CLAIMS AND MATERIAL FACTS, AND DEMAND FOR RELIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

On May 9, 2022, the Equal Employment Opportunity Commission Office of Federal Operations denied my request for reconsideration and upheld an administrative judge's June 26, 2020, summary judgment. I was informed that the decision of the Commission is final, and that there is no further right of administrative appeal from the Commission's decision. I was also informed that I had the right to file a civil action in an appropriate United States District Court. As directed, I filed a timely complaint with this court on February 3, 2023. I hereby incorporate my Statement of Claims, Statement of Material Facts, Demand for Relief, and the exhibits thereto, which are filed herewith.

**II.    STATEMENT OF CLAIMS**

The claims before the court are as follows:

Whether I was discriminated against on the basis of mental disability (anxiety disorder) when the following incidents occurred:

Claim 1: On 12 May 2014, I was informed that USSOCOM had decided not to retain my services due to my inability to successfully complete **four** Polygraph Creditability Assessment (PCA) examinations.

Page **1** of **16**

Claim 2: On 27 May 2014, I received notice of a reassignment action, which required me to move to the National Capital Region from Tampa, Florida.

Claim 3: On August 27, 2014, I was ordered to perform a Permanent Change of Station (PCS) from my home in Tampa, Florida to HQ Washington, DC based solely on my inability to successfully complete **five** PCA examinations.

### III.  STATEMENT OF MATERIAL FACTS

1. At all points relevant to the claims in this case, I was employed by the Defense Intelligence Agency (DIA) and held the position of Intelligence Analyst, GG-0132-13. In this capacity, I held a Top-Secret / Sensitive Compartmented Intelligence (TS/SCI) security clearance.  Until my involuntary reassignment to Headquarters DIA on August 27, 2014, I worked at the U.S. Special Operations Command (USSOCOM) in Tampa, Florida. Ex. 1 – MORTER, JOHN C-C PCS ORDERS,  Ex. 2 – email with orders attached.

2. On March 23, 2011, from 1145 to 1445, I was repeatedly administered a Counterintelligence Scope Polygraph (CSP) Examination in a local hotel room. According to the Senior Polygraph Examiner, analysis of the data collected during the testing revealed "No Opinion." This is also the first time on record that I mentioned experiencing anxiety with the polygraph process. (Ex. 3 – 1st polygraph examination) (Ex. 4 – DIA reply to OWCP RFI)

3. Two days later, on March 25, 2011, from 0758 to 1110, I was again repeatedly administered the CSP. According to the examination report, "analysis of the data collected during the examination revealed "No Opinion" could be rendered." (Ex. 5 – 2nd polygraph examination)

4. 10 months later, I was ordered back to the same hotel for another CSP. On January 12, 2012, from 1248 to 1535 I repeatedly answered questions and defended my answers. The examiner reported that I was administered three separate tests concerning mishandling classified information and unauthorized foreign contacts. Two tests were deemed "No Opinion," and on the last test I displayed a "Significant Response" to the questions. (Ex. 6 – 3rd polygraph examination)

5. Five months after that, on June 26, 2012, I was ordered to report to DIA Headquarters (DIAH) to meet with a Special Investigator.  At 1125, I signed a DIA Privacy Act and Interview Advisement and was interviewed by the Reporting Agent and the Investigator regarding my inability to successfully complete

the aperiodic CSP examination. The report provides details about my concerns and experiences with the PCA process and the topic of mishandling classified information. Ex. 7 – Agent Report 3 August 2012 That afternoon, from 1300-1500, I was once interrogated with the CSP. Although no result was explicitly stated in the examination report, the examiner writes, "Subject did not complete the referenced examination with no reportable information developed. Subject did not complete any security topics." Ex. 8 – 4th polygraph examination   However, the August 5, 2023, Polygraph Examination Report states that "No Opinion" was rendered on this examination. Also, in a letter to the Department of Labor, Brett A Stern, GG-15, Chief, DIA Credibility Assessment Program, classifies this examination as "No Opinion." (Ex. 4)

6. The following day, on Jun 27, 2012, I was ordered to report back to the Special Investigator at DIAH. His report is significant because it contains my signed Voluntary Sworn Statement. In that statement, I described my anxiety with the PCA, and that I had been suffering from nightmares about being interrogated and that I had fretted over the situation for months. Also, very significant is the fact that I reported the fact that I had conducted considerable research on the polygraph and talked with dozens of people about the subject in order to determine why I was having trouble passing the polygraph. Ex. 7.

7. 14 months later, on October 8, 2013, my Security Clearance Access was revoked, and I was banished from my duty position in the Sensitive Compartmented Information Facility (SCIF) at USSOCOM for my failure to pass the polygraph.

8. On October 17, 2013, after suffering the effects of what would later be diagnosed as Generalized Anxiety Disorder with Panic Attacks 309.02 (ICD-9-CM), Post-Traumatic Stress Disorder 309.89, and Major Depressive Disorder 296.2, Ex. 9 – Dr. Rothburd Diagnosis  I was able to see a psychologist (Dr. H. Magee) at the MacDill Air Force Base Medical Center. The doctor diagnosed me with Anxiety Disorder Anxiety 309.24. Ex. 10 – Morter J AHLTA note 17Oct 2013  This disorder is characterized by maladaptive reactions to identifiable psychosocial stressors occurring within a short time after onset of the stressor. They are manifested by either impairment in social or occupational functioning or by symptoms

(depression, anxiety, etc.) that are in excess of a normal and expected reaction to the stressor. (ICD-10-CM F43.22)

9. On November 3, 2013, DIA's Office of Security coordinated with USSOCOM and the DIA Insider Threat Program (InTP) Staff Psychologist to schedule an interview with me to determine whether psychological factors were responsible for my inability to "successfully complete portions of previous CSP examinations." On November 5, 2013, for approximately an hour, I met with Dr. Joe Soo-Tho, the InTP Staff Psychologist. I presented my theory for my inability to "pass" the polygraph and backed it up with printouts from some of the leading psychologists on polygraph research. I also presented a copy of DoDI 5210.91 and a recently completed study by the National Academy of Sciences. The doctor asked if he could have the printouts and made me initial the corners of each page. His line of questioning became increasingly accusatory, as he insisted that I was lying. This caused me to suffer an emotional breakdown and after witnessing it, the doctor advised me to get professional counseling. When I informed him that I had previously sought help with my mental issues, he requested that I send him copies of my medical records.

10. Upon returning to work on November 14, 2013, I submitted a trip report which included details of my meeting with Dr. Soo-Tho. Ex. 11 – EEOC ROI 048-50  I also provided my medical records to my supervisor, Timothy Grimes, Chief, GEOINT Branch, who in turn forwarded the documents to Frank Branch, Chief, USSOCOM Special Security Office (SSO), who in turn forwarded the documents to Dr. Soo-Tho and DIA's Office of Security. I also provided a letter to Grimes that was written by Dr. Magee that recommended that I be allowed to use liberal sick leave to address the symptoms of my disorders and prevent the deterioration of my overall functioning – which I did.  Ex. 12 – Morter J letter

11. On December 2, 2013, based solely on the previously mentioned interview and my medical records, K.M. (Joe) Soo-Tho, PhD, submitted a psychological evaluation. Ex. 13 – Soo-Tho Medical Report 02DEC2013  He explained that the primary purpose of the InTP psychological evaluation was to:

> assess and rule out any medical and/or psychiatric reasons underlying SUBJECT's inability to successfully complete the CSP examinations; (2) explore and address psychosocial factors which may have adversely impacted the outcome of these

examinations; and (3) identify appropriate interventions, if any, to support mitigation strategies.

The doctor noted that:

> A persistent degree of mild to moderate anxiousness was noted in SUBJECT's demeanor throughout the interview: this nervousness became more prominent when he was being confronted and when he was sharing his fears about the potential adverse impact of his unsuccessful CSP examination on his professional future.

He also noted that I reported to him that I had "suffered from anxiety for a long time" and characterized this as "a fear of failure." He reports that I told him that I had sought help from a psychiatrist. He states that I said that my anxiety has been exacerbated by my incomplete CSP examinations, so much so that I again sought mental assistance a few weeks prior. He acknowledges receiving the official diagnosis of my disability and describes my condition and its symptoms. After reviewing my diagnosis, he explains that my disorder:

> is associated with a cluster of psychological and emotional symptoms. Individual **predisposition and psychological/emotional vulnerabilities** are important factors in the occurrence of this condition, as well as the manifestation of symptom type, severity, duration, and prognosis. In order to be diagnosed with this condition, an individual's reactive symptoms or behaviors must be judged to be out of proportion to the intensity of the stressor, and to cause significant functional impairment.

Inexplicably, the doctor claimed that I "inadvertently revealed" that I had "done extensive research on polygraph examinations." There was nothing inadvertent about it, this was planned – I even had printouts with me to validate what I was saying. He asked if I had ever reported it to anyone else. When I informed him that I had (Ex. 7), he called me a liar and berated me for being a poor self-historian. In his conclusion, Dr. Soo-Tho asserted that I verbalized intent and demonstrated efforts to subvert the CSP examination. There is no evidence that I ever attempted to "subvert" anything. The doctor was deliberately trying to falsely portray my case by accusing me of something that I simply did not do. He also declares that I would be unlikely to be a suitable candidate for further polygraph testing. Ex. 14 – DIA Trip Report

12. On December 12, 2013, a DIA Agent Report was filed in response to a referral by SEC-3A. The Agent concluded that "based on information provided by the USSOCOM SSSO and the TMC Staff

Psychologist, no further investigative action was warranted, and this investigation should be closed in the files of this office." Ex. 15 – DIA Agent Report 10Jan2014

13. On January 31, 2014, as the Senior Security Clearance adjudicator within the Agency, the Chief, Defense Intelligence Central Adjudication Facility issued a Security Review and Evaluation Record:

> "Spouse's loss of employment due to a failed poly and SUBJ's repeated failure to pass the CSP exams, no doubt, have compounded his unfavorable expectations of such examinations and given rise to **an increasing degree of anxiety associated with each additional process. His negative attitude toward the poly will only result in continued failures**. Although the exam is a condition of employment, there is no current information provided to cast doubt on SUBJ's judgement, reliability, or trustworthiness. SUBJ has been in the intelligence business for 32 years and it may be important to note that, to date, no evidence of nefarious activity and/or improper conduct has been uncovered, and that his work history has been favorable. Given the above, it is recommended that he be: 1) referred for counseling to address his anxiety associated with the CSP exam; 2) retested (CSP) no sooner than six months from his last CSP examination (and preferably, following sufficient counseling); and 3) Continued to be scrutinized via other means (e.g. electronic monitoring, etc.) if deemed viable and realistic." In her handwritten notes, the Chief also states, "Researching the poly program is not an action that warrants revoking clearances, especially if there is a reason. Spouse could not get through her exam and lost her job. SUBJ has been diagnosed with an "Adjustment Disorder with Anxiety" and is in counseling. SUBJ should continue counseling and scheduled for another CSP within 6-12 months. Give Subj an Advisory Ltr." Ex. 16 – Security Review and Evaluation Record 31Jan14

14. On February 6, 2014, I received an advisory letter from Karen D.B. McCord, the Chief, Defense Intelligence Central Adjudication Facility (SEC-3.) This letter acknowledges my disability and encourages me to continue counseling/treatment with my psychiatrist. Other key statements in this letter include, "A favorable security decision was made on the basis of your decision to seek mental health care and comply with treatment recommendations." and "There is no restriction on your use of disclosure of the information." Ex. 17 – Advisory Letter 2-6-2014

15. On February 12, 2014, the same Chief, Personnel Security Division (SEC-3) replies to an email addressing the potential of an involuntary Permanent Change of Station (PCS) thusly:

> I non-concur with the recommendation to PCS Mr. Morter to the NCR. Justification: This only transfers an unresolved CSP to another element and I believe SOCOM has the ability to monitor his activities. Mr. Morter was seeking counseling for his anxiety, and I believe he should be given the opportunity to continue this treatment and be retested in 6 – 12 months. (Ex. 17)

16. On February 20, 2014, my supervisor, Tim Grimes composed a Memorandum for the Record, SUBJ: Supervisor Comments concerning Mr. John "Sam" Morter. Mr. Grimes provides extensive background and details of my exemplary record. He also corroborates my claims that we were given conflicting guidance on moving and marking data from different systems. Additionally, he remarks how I had been under a lot of stress, seeing a mental health specialist, and resolved to let the process play out. Ex. 18 – Supervisors Comments

17. On May 12, 2014, I was verbally counseled by Shawn M. Nilius that the Command decided not to retain my services.

18. On May 12, 2014, I initiated complaints to the SOCOM Office of Inspector General (OIG) Ex. 19 – email from SOCOM IG to Lawless and the DIA OIG that SOCOM was violating approved and relevant policies regarding the use of the polygraph. SOCOM OIG informed me that because I was a DIA employee, I would need to address the matter with DIA. The DIA OIG consulted with the DIA Office of Security and determined that this was "not a matter for the IG." Ex. 21 – DOD OIG Case Summary

19. On May 27, 2014, I was officially notified by Nilius that he supported the Command's decision not to retain my services and was provided written details from DIA HQ of the reassignment action. 22 – Nilus Formal Couseling

20. On June 2, 2014, I was able to get a referral from the MacDill AFB, Medical Center, Behavioral Health Clinic to see a psychologist to hopefully deal with my constant anxiety and recurrent nightmares, insomnia, and panic attacks. During the initial session, the doctor (Felix Subervi) informed me that because of my anxiety disorder, I was being held to a standard that was impossible for me to achieve. Essentially, my civil rights were being violated because they were using my disability against me. I had two appointments with this doctor then he referred me to Dr. Michael Rothburd. I saw Dr. Rothburd every week for two years.

21. On June 4, 2014, I composed a "Notice to Appeal" and sent it via email to Grimes, Nilius, Sharp, Branch, Lanham, Howell, Simpson, and Evitt. Ex. 23 - Morter Notice to appeal 4 Jun 2014  Ex. 24 –

email header for Notice to Appeal  Stephen Norton, DIA Director of Security even sent me a letter acknowledging receipt, Ex. 25 – Norton Letter  as did Nilius, and Howell.  In this Appeal, I stated,

> It is my contention that my polygraph testing experience had been compromised from the beginning - undoubtedly from a classic "guilt grabbing" condition - and resulted in a false positive on the question involving the handling of classified Information. Also significant, is the fact that I have been clinically diagnosed with an anxiety disorder - a medical condition that unquestionably invalidates the readings of the test, and one that could identify the decisions against me as discriminatory, based on Equal Employment Opportunity laws.

22. On June 13, 2014, with no resolution to my complaint on the horizon, I contacted the Agency's EEO department and filed a complaint. In the complaint, I stated:

> For the past eight months, I have been subjected to a series of discriminatory actions that have severely impacted my employment rights and opportunities. In addition to the direct violation of DoD regulations, I believe that I am being discriminated against due to a mental disability that essentially invalidates measurements obtained through the repetitive use of the polygraph examination. My inability to perform satisfactorily on this test is a direct result of the symptoms associated with the mental condition known as anxiety disorder. These symptoms include motor tension, autonomic hyperactivity, apprehensive expectation, irrational fear and severe panic attacks. I have been informed that the actions to suspend my security accesses, terminate my employment at the United States Special Operations Command and force my reassignment to Headquarters, Defense Intelligence Agency (DIA) are a direct result of my inability to "successfully pass" the Counter-Intelligence Polygraph and Credibility Assessment (PCA). Ex. 26 – Official EEO Complaint

I requested reasonable accommodations to allow me to return to my official duty position and to suspend the pending reassignment action until the polygraph issue is resolved.

23. On June 17, 2014, I was initially interviewed by an EEO counselor, and notified of my rights and responsibilities regarding the processing of my EEO Complaint.  I waived my right to remain anonymous during the informal process and elected to participate in Alternative Dispute Resolution.

24. On June 18, 2014, I was informed that Alternate Dispute Resolution was inappropriate with regards to the concerns that I had brought forth; consequently, I entered the formal EEO complaint process. (Ex. 26)

25. On July 31, 2014, I provided my leadership with an official diagnosis of Anxiety Disorder 300.02 and Post-Traumatic Stress Disorder 309.89. (Ex. 9)

26. On August 4, 2014, I was once again sent on official travel back to DIAH for another PCA. In an email from the JICSOC Deputy Director, the following question is asked: "What happens if Sam gets through this next poly round? If he favorably completes it all, do we re-visit his status with the DCOM?" Ex. 27 – email from Lawless to Branch

27. The Report of Investigation from this interview includes my signed sworn statement. In it, I am asked if there is anything I wished to add from the Voluntary Sworn Statement rendered by me on June 27, 2012. I said:

> Yes. The entire discussion surrounding my inability to remain calm has since been diagnosed as Anxiety disorder and Post-Traumatic Stress Disorder by a licensed psychologist, which was also acknowledged by DIA on February 6, 2014.

When I was asked, "Do you currently have any medical issues that you feel would inhibit your ability to successfully complete your counterintelligence scope polygraph examination?" My answer was: Yes. My doctor has diagnosed me with Anxiety Disorder and Post Traumatic Stress Disorder. I then provided the responsible officials with a copy of the diagnosis made by my psychologist, Michael I. Rothburd. (Ex. 9) Ex. 28 - signed sworn statement 8 4 2014

28. On August 5, 2014, from 0809 to 1215, I was once again subjected to repeated PCA examinations. The official Polygraph Examination Report states that I exhibited a "Significant Response." Ex. 29 – 5th polygraph examination

29. Immediately following the examination, I was directed to meet with two DIA psychologists. Dr. Jill Tucillo writes in the official DIA Psychological Consultation report:

> John Morter (SUBJECT), a 53-year-old SOCOM employee, was referred for psychological consultation at the request of Chief, SEC-5 due to SUBJECT's distraught emotional condition following HIS fifth failed Counterintelligence Scope Polygraph Examination (CSP). The purpose of our meeting with SUBJECT was to attempt to assuage HIS acute distress prior to HIS departing DIA HQ and to determine whether HE has a condition that is amenable to treatment.

The doctor also writes this under the heading "Recommendations:"

> SUBJECT's anxiety is acute and appears genuinely debilitating. Psychotherapy is a good start, but it appears insufficient to address anxiety of this proportion. HE was educated on the benefits of psychotropic medication and was encouraged to consider seeking another consultation with a psychiatrist. The sum of the available information

> suggests that SUBJECT is not likely to be a suitable candidate for future CSP examination. Ex. 30 – Tucillo Report Aug 6 2014

30. On August 13, 2014, I received official orders directing me to move to the Capital Region with a reporting date of August 24, 2014. Ex. 31 – email with orders attached (Ex. 1)

31. On August 22, 2014, I was briefly hospitalized with an acute panic attack. I was given medication, released, and told to follow-up with my doctor. Ex. 32 – Fl_Wesley_Chapel 8 22 14

32. On August 25, 2024, I reported to the DIA main lobby and was met by Dr. Soo-thoo, my new supervisor, and a lady from the personnel. I informed them that my doctor (Rothburd) suggested that due to my disabilities, I should invoke the Family Medical Leave Act. I did, it was granted, and I immediately returned home and went on sick leave. That was the last time I would ever set foot in a DIA facility.

## IV. **DISCUSSION**

At issue in this case is whether the Defendant knew of my disability, chose to ignore it, and used the results of a series of discriminatory polygraph "tests" to punish me. Throughout the course of my EEOC complaint, the Defendant claimed that they had no knowledge of my disabilities before any of the relevant decisions were made. With my statement of facts, I have proved without a shadow of a doubt that the responsible officials were acutely aware. These officials had every opportunity to grant my request for reasonable accommodations up until the time that I applied for disability retirement, but they refused to do so.

The Defendant tries to say that I failed to raise a claim to accommodate. This is blatantly false and misleading. It is a provable fact that I repeatedly requested reasonable accommodation from every responsible official possible, yet those requests were denied at every level. On June 4, 2014, after learning from my doctor that my disability was being used against me, I authored a notice to appeal and sent it to all concerned parties. It was acknowledged by the DIA Director of Security as well as my first- and second-line supervisors. In this letter, I expressed my objection over being punished because I couldn't "pass" the polygraph. I pointed out that I had been diagnosed with an anxiety disorder, and that

the decisions to punish me could be construed as discriminatory based on Equal Employment Opportunity (EEO) laws. I took my doctor's advice and initiated contact with an EEO counselor. I claimed that I was "being discriminated against due to a mental disability that essentially invalidated measurements obtained through the repetitive use of the polygraph examination." I requested to 1) return to my official duty position; and 2) have the pending reassignment action suspended until the polygraph issue was resolved. On June 18, 2014, I accepted the opportunity to participate in the Alternate Dispute Resolution (ADR) process; however, I was notified that ADR was inappropriate with regards to the concerns that I had brought forth. The Defendant had been formally notified of my complaint, had every opportunity to cancel my reassignment and return me to my duty position, but refused to do so. Moreover, the law does not compel employees to ask for accommodations at a certain time. Employees may ask for reasonable accommodation before or after being told of performance problems. Sometimes, an employee may not know or be willing to acknowledge that there is a problem requiring accommodation until the employer points out deficiencies in their performance. Once I figured out that my anxiety disorder was the cause of my inability to successfully complete the polygraph, I officially notified everyone involved.

The Defendant also claims that I cannot demonstrate that I was a qualified individual with a disability. A qualified individual with a disability is a person with a disability who meets the necessary skills, experience, education, and other job-related requirements of the position they hold or seek to hold and can perform the essential functions of the position with or without a reasonable accommodation. Essentially, an individual should not be disqualified solely because of an inability to perform incidental job functions. 42 U.S.C. § 12111(8). Subjecting an employee to the PCA is an incidental job function and not a disqualifying factor. In fact, Department of Defense Instruction (DoDI) 5210.91 Polygraph and Credibility Assessment (PCA) Procedures Encl 3, 2 (g) states:

> PCA examinations are a supplement to, not a substitute for, other methods of screening or investigation. No unfavorable administrative action (to include access, employment, assignment, and detail determinations) shall be taken solely on the basis of either a refusal to undergo a PSS examination or an unresolved PSS examination, except as provided in sections 6 and 7 of Enclosure 4.

In this case, sections 6 and 7 of Enclosure 4 do not apply[1]. Additionally, "unfavorable administrative action" is defined by the Code of Federal Regulations as "Adverse action taken as the result of personnel security determinations and unfavorable personnel security determinations as defined in this part." An Unfavorable personnel security determination" is defined as "A denial or revocation of clearance for access to classified information; denial or revocation of access to classified information; denial or revocation of a Special Access authorization (including access to SCI); nonappointment to or nonselection for appointment to a sensitive position; nonappointment to or nonselection for any other position requiring a trustworthiness determination under this part; reassignment to a position of lesser sensitivity or to a nonsensitive position. Ex. 33 - CFR 2014 title32, part 154.1 (bb)(cc)

Furthermore, at Enclosure 3, 2, l, 6, DoDI 5210.91 directs that DoD Components authorized to conduct PCA examinations shall write internal PCA policies and procedures to assess and determine whether an individual is medically, psychologically, and emotionally fit to undergo an examination. Enclosure 4, 2, h also directs that "The Heads of DoD Components approved to conduct PSS examinations or establish PSS programs to screen designated personnel shall establish written procedures to exempt or postpone examinations when individuals are considered medically, psychologically, or emotionally unfit to undergo an examination." Despite being instructed to do so, no one ever made the effort to contact my doctors for their input.

In fact, the Defendant had no intention of following these instructions as evidenced by Steven McIntosh's EEOC interrogatory when he said, "if a claim of disability was presented, it would not have altered the outcome as the issue is the DIA employee being unsuccessful in completing the CSP examination and presenting a threat, risk, or vulnerability to national security information and operations." Ex. 34 – Mcintosh interrogatory  Furthermore, in an email recovered via Freedom of Information Act (FOIA) it is learned that the Defendant believed that they did not have the ability to

---

1  The Defendant promotes a false impression of this regulation. It was written specifically to ensure that otherwise innocent employees are not punished based solely on their performance on a polygraph. Expert witnesses must be called to testify and provide an official interpretation.

mitigate the loss of the CSP tool (either by SUBJECT's inability to successfully complete the examination process, or through a medical deferment from the CSP examination process) while SUBJECT was assigned to USSOCOM spaces. Ex. 35 – FOIA-0062-2017 DIA email

The Defendant asserts that both DIA and SOCOM had an "honest belief" that my failure to pass the polygraph examination presented an unacceptable risk in my then-current position. There's nothing in the approved and relevant regulations that would support this "honest belief." In fact, the opposite is true. They unethically refused to accept my claim that my disabilities were the cause for me not being able to pass the CSP, and blatantly violated the approved and relevant regulations to do so. They have also attempted to change their reasons for punishing me by claiming that I researched the polygraph then lied about it to the agency psychologist. This could not be further from the truth, as I had already admitted to doing so in the June 2014 investigation. In fact, I came prepared and brought printouts of the information with me to support my contentions. Bringing printed copies of my research with me shows that I was prepared to demonstrate that I had been doing it. Regardless, according to the Chief of the Central Adjudication Facility, "researching the polygraph is not a disqualifying factor." The Defendant has even claimed that I attempted to subvert the polygraph. This is also not true. There is no documented instance of this ever happening in any of the polygraph examination reports. Besides, if I had used countermeasures and succeeded in passing the test, this entire situation would have never happened in the first place.

Finally, the Defendant asserts that my allegations regarding the polygraph passage rates do not show that individuals with disabilities fail to pass the examination at a higher rate than those without. In Fact, DIA disclosed in discovery in my EEOC complaint that from fiscal year 2011 through 2014, 30,099 polygraph examinations were administered. They admit that on average 13.25% of examinations result in "No Opinion." That equates to approximately 4,000 that ended with the same result as mine. Additionally, they reveal that on average, 5% of examinations resulted in a "Significant Response." That would mean that approximately 1,500 employees would have performed as I did, yet there is no record of

thousands of people being punished based solely on their inability to successfully complete the PCA. Ex. 36 - Agency's answers to Complainant's first set of Interrogatories

Deviating from the approved and relevant regulations, shifting justifications for their actions, and statistical evidence that similarly situated employees who did not suffer from mental, psychological, or emotional issues and were not punished are all indicators of triable pretext for discrimination in this case.

## V.  DEMAND FOR RELIEF

The Defendant's adverse actions have negatively impacted my life in a multitude of ways. I was unfairly banished from my position, stripped of my credentials, and treated like an outcast and a criminal - all because I could not control my anxiety in a high-pressure environment. I was forced to endure over 16 hours of repeated interrogations when I had done no wrong. As a result of that abuse, I submitted a request for disability retirement, which was quickly approved. In the psychological evaluation that I submitted for the application, the doctor writes:

> At the present, the patient's acute anxiety disorder and depression appear to be a result of his being repeatedly subject to a traumatizing set of stimuli (polygraph examination with verbal interrogation), which he could not refuse or avoid, for fear of losing his employment. With each unavoidable repetition of the polygraph examination his stress-responses and depressive affect cascaded to the point in which he cannot effectively function. Mr. Morter is acutely anxious, suffers moderate to severe depression and has suffered an acute insult to his self-esteem. The traumatizing events outlined above have caused the patient to suffer many emotional and physical losses.

My evaluations, supervisor's comments and letters from coworkers and other professionals show that I was an acknowledged leader in the Intelligence Community. I worked diligently for 34 years in a myriad of highly critical positions in the intelligence career field to attain the respect that I had. As retribution for the extensive and prolonged pain and mental suffering the Defendant has caused, to include ruination of my stellar career and the slander to my reputation and my character, a sizeable amount of monetary compensation will be required. Due to the abusive and pernicious way that these actions were carried out against me, I have acquired chronic psychiatric and psychological problems which require the continued use of medication and therapy.

It is impossible to put a value on intangibles like the destruction of my esteemed career, the defamation of my character and the effects that my disability will ultimately cause. I feel that I should be entitled to the maximum amount of compensatory damages allowed by law.

For Non-pecuniary Damages, I am requesting **$5,000,000**.

The Pecuniary Damages that I seek include lost wages and benefits, as well as all medical fees.

As a disabled retiree, I was reimbursed 60% of my pay for the first 12 months and 40% for each year thereafter until age 62 when I was converted to regular retirement status. I request the difference in this amount. I also request reimbursement of 281 hours of annual leave. After my sick leave ran out, I was forced to use the remainder of my annual leave balance. I was seen by Dr Michael Rothburd for 49 visits from June 2014 to October 2015, and I have been under the care of Dr Gary Arthur since September 2014. The total amount of Pecuniary Damages is estimated to be approximately **$588,000**.

## VI.    CONCLUSION

For all these reasons, Plaintiff respectfully requests that this Court reject Defendant's motion to dismiss this case or grant summary judgment. On the other hand, due to the overwhelming evidence that I have provided in this document, I respectfully request that this Court grant summary judgment in my favor and award damages as requested.

Date: October 22, 2023

Respectfully submitted,

John SJ Morter, MSgt, USAF Retired
Plaintiff

**List of Exhibits**

1 - MORTER, JOHN C-C PCS ORDERS
2 - email with orders attached
3 - 1st polygraph examination
4 - DIA reply to OWCP RFI

**List of Exhibits (cont.)**

5 - 2nd polygraph examination

6 - 3rd polygraph examination

7 - Agent Report 3 August 2012

8 - 4th polygraph examination

9 - Dr Rothburd Diagnosis

10 - Morter J AHLTA note 17Oct2013

11 - EEOC ROI 048-50

12 - Morter J letter

13 - Soo-Tho Medical Report 02DEC2013

14 - DIA Trip Report

15 - DIA Agent Report 10Jan2014

16 - Security Review and Evaluation Record - 31Jan14

17 - Advisory Letter 2-6-2014 b&w

18 - Supervisors Comments

19 - email from SOCOM IG to Lawless and DIA OGC

20 - DIA OIG MFR

21 - DOD OIG Case Summary

22 - Nilus Formal Counseling

23 - Morter Notice to appeal 4 Jun 2014

24 - email header for Notice to Appeal 4 Jun 2014

25 - Norton Letter

26 - Official EEO Complaint

27 - email from  to Lawless Branch

28 - signed sworn statement 8 4 2024

29 - 5th polygraph examination

30 - Tucillo Report Aug 6 2014

31 - email with orders attached

32 - Fl_Wesley_Chapel 8 22 14

33 - CFR-2014-title32-vol1-part154

34 - EEOC Mcintosh interrogatory

35 - FOIA-0062-2017 - DIA email

36 - Agency's Answers to Complainant's First Set of Interrogatories