Trip Report – DIA/SSO Questioning

TDY Date: 5-8 November 2013

DIA Investigator: Dr. Joe Soo-Tho

BACKGROUND:

In March of 2011, along with all other DIA civilians, I was directed by SOCOM/SSO to undergo a DIA Counter-Intelligence (CI) polygraph examination. For the most part, everything went well and I "passed" questions dealing with terrorism, espionage and unauthorized foreign contacts. One question in particular, however, dealing with handling classified information, apparently showed signs of – something. Throughout the next two hours, I was aggressively interrogated and advised that I was "obviously" withholding something. If I would just come clean and get whatever it was off my chest, we would be able to get through it. I denied withholding anything until the polygrapher finally relented, telling me that I would be notified for a follow-up. I knew right away what was bothering me -the way that we handle classified in the GEOINT Branch. Over the years, we were instructed to use removable media and even had an "exception to policy" because our data was in unique formats and was too large for traditional methods. What we did, was in fact intentional and actually could be considered mishandling, because if you follow the letter of the regulation, others weren't able to perform in this manner. To tell the truth, I was confused at the time as to whether I should bring it up, or like he said "confess", because it wasn't really anything anyway. Upon returning to work, I immediately reported to the SSO and told them what happened.

Soon after learning that I had to go back the following week, I really started to panic. I knew which question I would fear – the one I had already reacted on. I told the investigator my concerns with the question, but apparently I didn't do a good enough job explaining it to him. I remember him saying, "if it was legal, don't worry about it" and proceeded to question me under polygraph with "other than what we discussed, have you ever...... My reaction was uncontrollable – I could feel the fear and sensed butterflies in my stomach. The investigator tried and tried, even solicited a second opinion, but each time he asked the question, I experienced the same sensation. After hours of interspersing the question with different "control" questions, the session deteriorated. The investigator became increasingly accusative and angry, acting as though I was hiding something. Ultimately, I was ordered to grab my things, leave his room and told that I would be contacted – eventually. I was in a state of shock and had to sit in the hotel lobby for a while until I felt calm enough to drive back to work. Again, I reported to the SSO and told them what happened.

A year passed until SOCOM/SSO sent me another polygraph appointment notification. I then knew that this wasn't going to go away. I delivered a four point paper detailing the reasons that I felt caused my physiological reaction to the question. These concerns all dealt with the confusing and controversial ways that we transferred data between JWICS to SIPRnet to removable media - and my apprehensions about those processes. Overwhelmed with anxiety, I knew what was about to happen during this session and discussed the concern I had about the "handling classified" question with the investigator. My efforts failed and he proceeded to ask the frustrating question over and over. Each time I would get more and more uncomfortable until it was useless. It wasn't the content of the question so much as

Attachment C

**MORTER AGY 0058**

what it represented. Throughout this whole ordeal, the main thing that I've learned is that the fear of failing is a powerful and irrepressible emotion. One that the polygrapher interprets as a lie.

In June 2012, I was notified by SOCOM/SSO that I would need to go TDY to DIA for an official investigation regarding the matter. This would end up being a two day ordeal. Meeting this time with two investigators, I was able to state my case and describe my 34 years of government service, but unable to reconcile with the crux of the matter. I was frustrated and distraught, but they gave me one last try at the question – this time in an execution chamber-like setting. Predictably, under the bright lights and pressure filled environment, I panicked uncontrollably as they asked the question – over and over, each time probably worse than the last. Finally, they stopped the test and we returned to the investigator's office where I was given the opportunity to make a final, sworn statement.

Nearly a year and a half later, after returning to work after the furlough on October 6th, I received a message from William Lanham, J2X. He requested that I make an appointment with his secretary as soon as possible to discuss a security matter. Upon meeting with Mr. Lanham, I was troubled to learn that SOCOM was revoking my access to SCI and transferring me temporarily to an area outside the SCIF. He had a plan which included a TDY to DIA to meet with the Agency's psychologist. According to him, this doctor would be able to help me to get over whatever was bothering me and ultimately pass the polygraph. Due to the government shutdown and absence of funds, the TDY was postponed indefinitely. Finally, funds were disbursed and the TDY was scheduled for 5-8 November.

\*\* Note: Approximately two months prior to my first polygraph, my wife was interrogated, polygraphed and judged to be untrustworthy by this same practice. Absent of any adverse acts or corroborating information in her record, her access to SCI was revoked. Since she was a contractor, under current policies and regulations, she was not afforded the same level of fairness and justice that is afforded to government civilians. She eventually lost her job as a foreign exchange coordinator at CENTCOM and her life-long career in intelligence was ruined.

### TODAY'S APPOINTMENT

Dr. Joe Soo-Tho met me in the lobby at 0910. I was able to facilitate entry to his office by getting badged (TS/SCI) at the entry control point by the time he arrived.

Introductions included signing legal paperwork that stripped me of my rights concerning what we were about to discuss. I immediately presented my hypothesis for my uncontrollable emotional responses and backed it up with printouts from some of the leading psychologists on polygraphic research. He then keyed in on this development and asked if he could have the printouts – ostensibly as evidence. Dr. Soo-Tho then engaged rather skeptically through a line of questioning, sometimes seeming friendly, but always very direct. He definitely did his homework and knew every detail of my wife's interrogation.

Even though I continuously pleaded my version of the events, he insisted that I was hiding something. At one point, he even advised me that I needed professional counseling – apparently because I was visibly distraught.

Attachment C

**MORTER AGY 0059**

Ultimately, he concluded that I generated false positives because I had done research in to the polygraph and lied to the polygrapher when asked if I had. For the record, I recollect telling the polygrapher that I had in fact researched the polygraph – its accuracy and its validity. This is probably a natural reaction after learning how the most honest person in my life had been determined to be untrustworthy and fell victim to this process.

The appointment ended at approximately 1130 and Dr. Soo-Tho walked me out to the main lobby. Along the way, he told me that I should to go back to the hotel and await his phone call for a possible follow-up meeting.

After waiting until noon on Thursday and at the direction of Tim Grimes, I called Dr. Soo-Tho to inquire about any outstanding issues. The Dr. indicated that if none of the investigators had further issues which required me to be there, I was free to leave. Not knowing which investigators he was referencing, I assumed there wouldn't be a call from them so I returned home.

Follow-up: January 8th, 2014

After three months of sitting in the HQ Commandant's office with nothing but a Secret badge and access only to NIPRnet, I've been asked if I would like to work over at the Joint Special Operations University (JSOU). At this time, I'm waiting for word from the JSOU Director as to whether or not they can use me.

A couple items concerning this matter that I would like to document are:

- On January 6th, 2014, I learned from the SOCOM Security Management Office that my clearance is still listed as TS/SCI in JPAS. This would indicate that DIA has never suspended, revoked, or otherwise restricted my access. So, if DIA isn't concerned, why is SOCOM?

- A report was never completed by DIA regarding the investigation I had June 2012, which if accomplished would have eliminated the need for SOCOM leadership to revoke my access.

- According to SOCOM/J2X on 6JAN14, they're still awaiting a "final report" from DIA. I questioned whether DIA knows that they need to do a final report, especially since I still have TS/SCI in JPAS.

- According to the SOCOM SSO, DIA is holding a panel this week or next, where my situation will be addressed.

Attachment C

**MORTER AGY 0060**