From:  John S. Morter, GG-13                                                         4 June 2014

Subject:  Notice to Appeal

To:  Whom it may concern

1. This letter serves to inform all that were involved with the decisions to temporarily suspend my security clearance access, terminate my employment at the United States Special Operations Command and force my reassignment to headquarters, Defense Intelligence Agency (DIA), that I intend to appeal to the highest levels possible.  The use of questionable and/or dishonest tactics to punish innocent people is unacceptable and should never be tolerated.  Additionally, I request that oversight investigations be conducted to ensure that all involved are trained on the limitations and proper use of polygraph results and that no other policies and/or regulations are being circumvented or violated related to the use of the polygraph.

2. In a letter from the DIA Insider Threat Program (InTP) Coordinator (attachment A), it is stated that "Your inability to successfully complete the counter intelligence-scope polygraph examination is a basic security requirement for all DIA employees, presents a security vulnerability that must be mitigated."  If this is the case, I contend that there are guidelines in place and instructions on how to proceed if there is an unresolved counter intelligence-scope polygraph examination involving an employee who is already in access and no there is no other issue specific or derogatory information - and they do not involve the unwarranted suspension of access, or termination of assignment, and certainly do not authorize a forced relocation out of the local area.  The entire letter is an attempt to skirt regulations and policies by using contradicting statements and confusing terminology to suggest that I somehow present a "vulnerability", but not a risk.

3. It is extremely important to note that 10 months after my second attempt at the polygraph exam, one where the examiner forcefully interrogated me to the brink of a nervous breakdown, I was directed to report to DIA for an in-depth investigation concerning the matter.  This two day interview took place back in June 2012 – two years ago.  Without knowing the outcome of this investigation and based on the fact that I still hold a TS/SCI clearance according to DIA's Central Adjudication Facility, the results of that investigation must not have revealed any concerns or "vulnerabilities" that would jeopardize national security.

4. Another meeting/investigation in early November 2013 by the DIA Insider Threat Program/Special Security Office resulted in the issuance of an advisory letter (attachment B), which by all indications, continues to authorize my access to TS/SCI.  During this meeting, the official in charge decided that I not undergo additional polygraph examination because he believed that the polygraph had been compromised, signifying that the use of the test would be erroneous and unfair.  It is my contention that my polygraph testing experience had been compromised from the beginning – undoubtedly from a classic "guilt grabbing" condition - and resulted in a false positive on the question involving the handling of classified information.  Also significant, is the fact that I have been clinically diagnosed with an anxiety disorder - a medical condition that unquestionably invalidates the readings of the test – and one that could identify the decisions against me as discriminatory, based on Equal Employment Opportunity laws.

5. Throughout this entire ordeal, I've tried to impress upon my leadership and the security officials involved that they are all overlooking the fact that the polygraph is fallible, and on its own, an unreliable indicator of a threat, risk, or as stated in the letter from the DIA InTP, a "vulnerability". The truth in this statement is as obvious as it is ignored. The polygraph is simply a set of instruments that record an individual's physiological condition. Rules, regulations and policies have been developed and implemented due to this fact and are designed specifically to protect the employee from the type of abuse that I am experiencing. I would expect that due diligence and compliance with DoD rules and regulations is essential before making irrational decisions that could bring to an end an otherwise stellar 34 year professional career.

6. To bolster my case and help bring clarification on the matter, I present Department of Defense Instruction Number 5210.91 "*Polygraph and Credibility Assessment (PCA) Procedures*" which establishes and implements policy, assigns responsibilities, and provides procedures governing the use of the polygraph and other approved credibility assessment tools. Encl. 3, Para 2. g. states specifically that "PCA examinations are a supplement to, not a substitute for, other methods of screening or investigation. No unfavorable administrative action (**to include access, employment, assignment, and detail determinations**) shall be taken solely on the basis of either a refusal to undergo a Personnel Security Screening (PSS) examination or an unresolved PSS examination, except as provided in sections 6 and 7 of Enclosure 4."

7. Additionally, Encl. 4, Sec. 6. REFUSAL TO TAKE OR COMPLETE A PSS states that "DoD-affiliated personnel who refuse to take or complete a polygraph examination, and are in positions designated as requiring a PSS polygraph examination as part of determining initial eligibility for access to Top Secret, SAP, or other sensitive intelligence or operational information or for initial assignment or detail to the CIA or other IC elements, may be denied access, assignment, or detail."

8. Further, Encl. 4, Sec 7. FAILURE TO RESOLVE A PSS states "DoD-affiliated personnel in positions cited in section 6 of this enclosure who are unable to resolve all relevant questions of a PSS shall be so advised. The results of the examination shall be forwarded to the requesting agency."

    a. If, after reviewing the examination results, the requesting agency determines that they raise a significant question relevant to the individual's eligibility for a security clearance or continued access, the individual shall be given an opportunity to undergo additional examination.

    b. If the additional examination fails to resolve all relevant questions, the Head of the DoD Component may initiate a CI investigation in accordance with DoD policy.

    c. Additionally, the Head of the relevant DoD Component may temporarily suspend an individual's access to controlled information and deny the individual assignment or detail that is contingent on such access, **based upon a written finding that**, considering the results of the examination and the extreme sensitivity of the classified information involved, access under the circumstances poses an unacceptable risk to the national security. Such temporary suspension of access may not form the part of any basis for an adverse administrative action or an adverse personnel action.

    d. **The individual shall be advised in writing of the determination, that the determination may be appealed** to the Head of the relevant DoD Component, and that his or her final determination is conclusive.

9. I have always taken my responsibilities very seriously and would never do anything to jeopardize the Nation's security. I've held a TS/SCI security clearance through various organizations for over 33 years without a single security-related incident. I've undergone six Single Scope Background Investigations where investigators have interviewed my bosses, my co-workers and even my neighbors. And finally, after having difficulties with one of the questions on the polygraph, I've been investigated and scrutinized even more - not once has there ever been a finding or a reason to question my loyalty or trustworthiness. Now, I've found myself in the unfortunate situation where I cannot prove that I am not something that I am not.

10. To explain my experience with DIA's PCA process and detail some of the reasons that I felt were causing me to react anxiously to one of the polygraph questions, I submit attachments C and D. Additionally, I would like to provide a character reference letter, attachment E, which was written by my supervisor of the last 12 years.

11. Finally, a forced reassignment may not seem like an adverse action to some, but is extremely devastating to me and my family both financially and emotionally. An involuntary relocation outside of the local commuting area is an unacceptable burden that may result in my refusal to comply.

John S. Morter, GG-13
GEOINT Branch, Joint Intelligence Center
U.S. Special Operations Command
MacDill AFB, FL 33544

Attachments:

A. Reassignment Action letter (U-14-87,038/TMC, 21 May 2014), signed by Steven D. McIntosh, Insider Threat Program Coordinator.
B. Advisory Letter Concerning Continued Access to Sensitive Compartmented Information (FOUO-94,210/SEC-3B)
C. Trip report written by John S. Morter, titled "DIA/SSO Questioning" and provided to SOCOM leadership. Dated approximately 12 November 2013.
D. Memo written by John S. Morter, titled "My concerns with the question – Have you ever intentionally mishandled classified information?" provided to SOCOM SSO and leadership. Dated approximately 29 March 2011.
E. Memo written by Timothy Grimes, titled "Supervisor Comments concerning Mr. John "Sam" Morter", dated 20 February 2014.

UNCLASSIFIED



DEFENSE INTELLIGENCE AGENCY
WASHINGTON, DC 20340-5100



U-14-87,038/TMC                                                                                                      21 May 2014

To:   GG-13 John S. Morter
      Joint Operations Intelligence Center
      U.S. Special Operations Command
      MacDill AFB, FL

SUBJECT: Reassignment Action

1. The Defense Intelligence Agency Insider Threat Program (DIA InTP) bears responsibility for identifying and mitigating security vulnerabilities presented by the assignment of DIA employees to any position. A security vulnerability may exist due to a number of factors, including those that are beyond the direct control of the employee. Regardless of the type of vulnerability, the DIA InTP must determine how best to mitigate the potential for harm to national security.

2. It is fundamental to the process that DIA InTP not ask other elements of the Department of Defense to accept the potential risk presented by any security vulnerability. In that vein, DIA will not ask a Combatant Command to host a DIA employee within their operations when a security mitigation plan must be implemented that is not in line with the command's mission or capabilities.

3. Your inability to successfully complete the counterintelligence-scope polygraph examination, which is a basic security requirement for all DIA employees, presents a security vulnerability that must be mitigated. As you know, the inability to pass the examination does not -- on its own -- suggest you are a risk to national security. Instead, it presents a vulnerability that must be considered and properly mitigated. The mitigation strategy implemented is designed to better protect national security while giving you the opportunity to eliminate the vulnerability.

4. The DIA InTP has determined this vulnerability can be properly mitigated by an assignment to DIA Headquarters. This is not intended to be a setback with respect to your career. As noted above, it is instead intended to give you and this Agency a better opportunity to eliminate the vulnerability. The DIA InTP has requested the Office of Human Resources (OHR) reassign you to a DIA Headquarters. Upon arrival at DIA Headquarters, you will meet with your new leadership team and a representative from the DIA InTP to discuss future requirements and actions designed to resolve this vulnerability.

STEVEN D. McINTOSH
Insider Threat Program Coordinator

cc: OGC (Mr. Evitt)
    SEC (Ms. McCord)
    OHR (Ms. Sanborn)

UNCLASSIFIED

Attachment A

UNCLASSIFIED//FOR OFFICIAL USE ONLY




### DEFENSE INTELLIGENCE AGENCY
### WASHINGTON, D.C. 20340

FOUO-94,210/SEC-3B

FEB 0 6 2014

To:  Mr. John S. Morter

Subject:  Advisory Letter Concerning Continued Access to Sensitive Compartmented Information

References:  
a. Executive Order 12968, Access to Classified Information, 2 August 1995
b. Intelligence Community Directive 704, "Personnel Security Standards and Procedures Governing Eligibility for Access to Sensitive Compartmented Information and Other Controlled Access Program Information," 1 October 2008
c. Department of Defense Regulation 5200.2-R, "Personnel Security Program," January 1987 (Change 3, 23 February 1996)

1. The Defense Intelligence Central Adjudication Facility is the Sensitive Compartmented Information (SCI) adjudicative authority for all personnel affiliated with the Defense Intelligence Agency (DIA). All personnel required to have access to SCI are subject to initial and periodic examinations of a sufficient period of their lives to make a determination that they are not now nor are likely to become unacceptable security risks. These examinations include a review of a person's general character through personal interviews and/or background investigations.

2. In accordance with the above references, you are issued this Advisory Letter due to your inability to successfully pass four Counterintelligence Scope Polygraph examinations on 23 March 2011, 25 March 2011, 31 January 2012, and 26 June 2012, respectively, and your diagnosis for Adjustment Disorder with Anxiety 309.24.

3. The US Government recognizes the critical importance of mental health and advocates proactive management of mental health conditions to support wellness and recovery. The decision to seek mental health care will not in and of itself adversely impact an individual's ability to obtain or maintain a national security position. In fact, seeking personal wellness and recovery may favorably impact the individual's eligibility for a national security position. All information pertaining to treatment will be handled on a strict need-to-know basis and any misuse of information provided will be punishable under applicable privacy laws.

4. A favorable security clearance determination was made on the basis of your decision to seek mental health care and comply with treatment recommendations, viewed as positive signs that you recognized a problem existed and you were willing to take steps towards resolving them. Any changes in your condition, diagnosis, treatment, prognosis, or incidents arising from such should be reported to the DIA Central Adjudication Facility. You are encouraged to continue your counseling/treatment with your psychiatrist concerning your diagnosis and address your anxiety associated with the CSP examination.

*PERSONAL DATA*
*To Be Treated in a Confidential Manner*

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Attachment B

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

5. Eligibility for SCI is a process of continuing evaluation. Any failure by you to maintain security standards, that could raise questions as to your judgment, reliability, or willingness to adhere to security requirement, may result in loss of SCI access eligibility.

6. By your receipt and signature for this Advisory Letter, you are acknowledging the responsibilities that attend the trust the government places in those to whom it gives security clearances. There is no restriction on your use or disclosure of the information.

Enclosures
1. Acknowledgement Receipt
2. Pertinent Adjudicative Guidelines

Karen D.B. McCord
Chief, Defense Intelligence
Central Adjudication Facility

Attachment B

*PERSONAL DATA*
*To Be Treated in a Confidential Manner*
**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

Trip Report – DIA/SSO Questioning

TDY Date: 5-8 November 2013

DIA Investigator: Dr. Joe Soo-Tho

BACKGROUND:

In March of 2011, along with all other DIA civilians, I was directed by SOCOM/SSO to undergo a DIA Counter-Intelligence (CI) polygraph examination. For the most part, everything went well and I "passed" questions dealing with terrorism, espionage and unauthorized foreign contacts. One question in particular, however, dealing with handling classified information, apparently showed signs of – something. Throughout the next two hours, I was aggressively interrogated and advised that I was "obviously" withholding something. If I would just come clean and get whatever it was off my chest, we would be able to get through it. I denied withholding anything until the polygrapher finally relented, telling me that I would be notified for a follow-up. I knew right away what was bothering me -the way that we handle classified in the GEOINT Branch. Over the years, we were instructed to use removable media and even had an "exception to policy" because our data was in unique formats and was too large for traditional methods. What we did, was in fact intentional and actually could be considered mishandling, because if you follow the letter of the regulation, others weren't able to perform in this manner. To tell the truth, I was confused at the time as to whether I should bring it up, or like he said "confess", because it wasn't really anything anyway. Upon returning to work, I immediately reported to the SSO and told them what happened.

Soon after learning that I had to go back the following week, I really started to panic. I knew which question I would fear – the one I had already reacted on. I told the investigator my concerns with the question, but apparently I didn't do a good enough job explaining it to him. I remember him saying, "if it was legal, don't worry about it" and proceeded to question me under polygraph with "other than what we discussed, have you ever…... My reaction was uncontrollable – I could feel the fear and sensed butterflies in my stomach. The investigator tried and tried, even solicited a second opinion, but each time he asked the question, I experienced the same sensation. After hours of interspersing the question with different "control" questions, the session deteriorated. The investigator became increasingly accusative and angry, acting as though I was hiding something. Ultimately, I was ordered to grab my things, leave his room and told that I would be contacted – eventually. I was in a state of shock and had to sit in the hotel lobby for a while until I felt calm enough to drive back to work. Again, I reported to the SSO and told them what happened.

A year passed until SOCOM/SSO sent me another polygraph appointment notification. I then knew that this wasn't going to go away. I delivered a four point paper detailing the reasons that I felt caused my physiological reaction to the question. These concerns all dealt with the confusing and controversial ways that we transferred data between JWICS to SIPRnet to removable media - and my apprehensions about those processes. Overwhelmed with anxiety, I knew what was about to happen during this session and discussed the concern I had about the "handling classified" question with the investigator. My efforts failed and he proceeded to ask the frustrating question over and over. Each time I would get more and more uncomfortable until it was useless. It wasn't the content of the question so much as

Attachment C

what it represented. Throughout this whole ordeal, the main thing that I've learned is that the fear of failing is a powerful and irrepressible emotion. One that the polygrapher interprets as a lie.

In June 2012, I was notified by SOCOM/SSO that I would need to go TDY to DIA for an official investigation regarding the matter. This would end up being a two day ordeal. Meeting this time with two investigators, I was able to state my case and describe my 34 years of government service, but unable to reconcile with the crux of the matter. I was frustrated and distraught, but they gave me one last try at the question – this time in an execution chamber-like setting. Predictably, under the bright lights and pressure filled environment, I panicked uncontrollably as they asked the question – over and over, each time probably worse than the last. Finally, they stopped the test and we returned to the investigator's office where I was given the opportunity to make a final, sworn statement.

Nearly a year and a half later, after returning to work after the furlough on October 6th, I received a message from William Lanham, J2X. He requested that I make an appointment with his secretary as soon as possible to discuss a security matter. Upon meeting with Mr. Lanham, I was troubled to learn that SOCOM was revoking my access to SCI and transferring me temporarily to an area outside the SCIF. He had a plan which included a TDY to DIA to meet with the Agency's psychologist. According to him, this doctor would be able to help me to get over whatever was bothering me and ultimately pass the polygraph. Due to the government shutdown and absence of funds, the TDY was postponed indefinitely. Finally, funds were disbursed and the TDY was scheduled for 5-8 November.

** Note: Approximately two months prior to my first polygraph, my wife was interrogated, polygraphed and judged to be untrustworthy by this same practice. Absent of any adverse acts or corroborating information in her record, her access to SCI was revoked. Since she was a contractor, under current policies and regulations, she was not afforded the same level of fairness and justice that is afforded to government civilians. She eventually lost her job as a foreign exchange coordinator at CENTCOM and her life-long career in intelligence was ruined.

TODAY'S APPOINTMENT

Dr. Joe Soo-Tho met me in the lobby at 0910. I was able to facilitate entry to his office by getting badged (TS/SCI) at the entry control point by the time he arrived.

Introductions included signing legal paperwork that stripped me of my rights concerning what we were about to discuss. I immediately presented my hypothesis for my uncontrollable emotional responses and backed it up with printouts from some of the leading psychologists on polygraphic research. He then keyed in on this development and asked if he could have the printouts – ostensibly as evidence. Dr. Soo-Tho then engaged rather skeptically through a line of questioning, sometimes seeming friendly, but always very direct. He definitely did his homework and knew every detail of my wife's interrogation.

Even though I continuously pleaded my version of the events, he insisted that I was hiding something. At one point, he even advised me that I needed professional counseling – apparently because I was visibly distraught.

Attachment C

Ultimately, he concluded that I generated false positives because I had done research in to the polygraph and lied to the polygrapher when asked if I had. For the record, I recollect telling the polygrapher that I had in fact researched the polygraph – its accuracy and its validity. This is probably a natural reaction after learning how the most honest person in my life had been determined to be untrustworthy and fell victim to this process.

The appointment ended at approximately 1130 and Dr. Soo-Tho walked me out to the main lobby. Along the way, he told me that I should to go back to the hotel and await his phone call for a possible follow-up meeting.

After waiting until noon on Thursday and at the direction of Tim Grimes, I called Dr. Soo-Tho to inquire about any outstanding issues. The Dr. indicated that if none of the investigators had further issues which required me to be there, I was free to leave. Not knowing which investigators he was referencing, I assumed there wouldn't be a call from them so I returned home.

Follow-up: January 8th, 2014

After three months of sitting in the HQ Commandant's office with nothing but a Secret badge and access only to NIPRnet, I've been asked if I would like to work over at the Joint Special Operations University (JSOU). At this time, I'm waiting for word from the JSOU Director as to whether or not they can use me.

A couple items concerning this matter that I would like to document are:

- On January 6th, 2014, I learned from the SOCOM Security Management Office that my clearance is still listed as TS/SCI in JPAS. This would indicate that DIA has never suspended, revoked, or otherwise restricted my access. So, if DIA isn't concerned, why is SOCOM?

- A report was never completed by DIA regarding the investigation I had June 2012, which if accomplished would have eliminated the need for SOCOM leadership to revoke my access.

- According to SOCOM/J2X on 6JAN14, they're still awaiting a "final report" from DIA. I questioned whether DIA knows that they need to do a final report, especially since I still have TS/SCI in JPAS.

- According to the SOCOM SSO, DIA is holding a panel this week or next, where my situation will be addressed.

Attachment C

My concerns with the question – 'have you ever intentionally mishandled classified information?'

1. Approximately 30-40% of my duties involve the transfer of classified data in support of national-level intelligence requirements, Special Operations planning and support to the war fighter. Because we use systems on both SIPRnet and JWICS, we are constantly moving data back and forth between them. This is accomplished via removable hard drive, DVD/CD and sometimes floppy disk. Usually, imagery and other data is acquired on the JWICS and moved down to the SIPRnet or standalone workstation for processing, and then moved back up to the JWICS for dissemination. Occasionally, some files are required to be downloaded from the JWICS only to disseminate on the SIPRnet. Another aspect is that some of our workstations are stand-alone and not connected to a network. As far as I know, they've never been officially designated as classified, but we use classified information on them, so we've internally designated them as classified – at one time several years ago as Top Secret, then more recently as Secret. Confusion usually arises as to what we should classify the removable media taken from these machines, ultimately developing in to feelings of inappropriate behavior. At one point we've heard that it's okay to mark a CD Secret if it only contains Secret data, but was taken from the JWICS. Then later we find out that it should have been marked Top Secret. We've also been instructed to document each and every file that is moved down from JWICS on a spreadsheet for accountability purposes. This spreadsheet currently consists of thousands and thousands of files. Although I have diligently tried to keep up with this list, due to overwhelming circumstances, I cannot state with a clear conscience that every single file that has been moved down has made it to the list. As a side note, we have never been required to provide this list to anyone.

2. Over the course of the last 12 years, we have been authorized to move data in this way, and then told to stop (BUCKSHOT YANKEE), and then told it was okay. Often times there were grey areas where we weren't exactly sure what we were doing was officially authorized, but in the interest of supporting the war fighter, we went ahead and moved the data. In the early 2000's, we were even told that we had an 'exception to policy' that authorized us to move classified data via removable media. Although I had never seen this 'exception to policy', I often felt that have been in some way circumventing the approved methods. Later, I was directed to self study for the Information Transfer Authority (ITA) test. The way this test worked was that you had to score at least 90% and you could only take it three times – the third failure would result in denial of the

authority. After falling short on the first two attempts, I decided that I would put off taking the test for the third time for as long as possible. This decision allowed us to continue transferring data without interruption for at least another few weeks. After being contacted by the Information Assurance Office on several occasions that they would have to lock down our machines if we weren't ITA certified, I studied intensely, took the test for the third time and finally passed.

3. Throughout the history of this office, we have been required to burn CDs/DVDs/floppy disks from either JWICS or SIPRnet and label them according to their contents. Up until about a year ago, this was accepted practice – depending on who you listened to. Some people would say it was fine, while others said that the removable media should be labeled with the level of classification of the system it came from. I was always uncomfortable with this practice and would always do it in trepidation. Now, according to SOCOM regulations, we have permission to create a disk with the classification of the system it was taken from, but not allowed to create and label a disk with a lower classification than the system it was taken from. Instead, a form 14 and an ECR is required before J6 representatives will perform the procedure for the requestor.

4. To help remedy these types of problems and address potential areas of concern to conscionable workers like me, SOCOM JICSOC leaders have directed J6 computer support personnel to create a workstation that has all the necessary applications on the JWICS. Although this would seem like an easy task, we have been waiting for over two years for the workstations to come online. In the meantime, we continue to transfer classified data back and forth between the domains adhering to current security requirements. Even when/if this gets accomplished, we will still face the dilemma of transferring down to SIPRnet for dissemination to the war fighter.

John S. Morter, GS-13
HQ USSOCOM, J2-JIC-GEOINT

Attachment D

JICSOC GEO                                                                                              20 FEB 14

Memo For the Record

SUBJ: Supervisor Comments concerning Mr. John "Sam" Morter

1. Mr. John "Sam" Morter is a GG-13 DIA civilian serving in the JICSOC GEOINT Branch since 2002. Mr. Morter leads the branch's scene visualization effort, identifies requirements, refines production processes, and generates highly accurate, realistic 3D portrayals. During this period Mr. Morter also served as an Information Transfer Authority to move GEOINT data across networks because SOCOM's ISSE Guard is unable to perform two person reviews for many GEOINT file types. In all aspects of his duties, Mr. Morter has excelled as documented in his civilian evaluations; I've included the two latest. Mr. Morter has had no security incidents in his 13+ years at USSOCOM and held a TS/SCI clearance for 34+ years.

2. Mr. Morter's tenure at USSOCOM has been characterized by initiative and a sustained, dedicated effort to increase his tradecraft knowledge to better support SOCOM and SOF scene visualization efforts. Mr. Morter came to the command with two CCAF Associates Degrees. While working here full time in 2009, he earned a Bachelor's of Arts Degree from USF. In 2010, he competed and won a Pat Roberts Scholarship from DIA, which allowed him to obtain a Graduate Certificate in Geospatial Intelligence from Penn State. Since then, he has been working on a Master's Degree in Geospatial Information Systems (GIS) from Penn State, and hopes to complete his degree this summer. Demonstrating real enthusiasm, Mr. Morter actively looks for ways to put this formal education to better use for Branch and Command GEOINT efforts.

3. Mr. Morter's military and civilian work history demanded he obtain and hold a TS/SCI clearance. From 1979-1987, Mr. Morter served as an USAF Cryptologic Linguist as a crew member on various, airborne SIGINT platforms and at ground stations. In 1987-1999, he served tours as an Imagery Analyst at NAIC (now NASIC at Wright-Patterson AFB) and in the Target's Shop at USCENTCOM. Upon military retirement in 1999, he was hired as a contracted imagery systems trainer here at USSOCOM and later in 2002 as an Intelligence Analyst in the Imagery/GEOINT Branch.

4. Mr. Morter's performance here at USSOCOM has been consistently exemplary with no security incidents or issues. He has been a key contributor to our scene visualization efforts and enthusiastically shares its virtues with SOF users and IC counterparts, as well as the benefits of Google Earth. As one of the top IC scene visualization experts, Mr. Morter played a key role in establishing an IC Interagency

Attachment E

Scene Visualization Working Group which became the Photogrammetry and 3D Visualization Community of Practice and served on its steering committee. He helped host the 3rd Annual Conference a few years ago with 50+ in attendance. He has also presented numerous scene visualization briefings at national level conferences such as NGA's annual NSG Users' Conference, the NRO's Innovative Solutions Showcase, several BAE's User's Group Conferences, and NGA's 3D Community of Practice Conferences. Mr. Morter's knowledge and vision are persuasive, focused on leveraging the best this evolving technology can offer.

5. Again, throughout this whole period, no security issues were observed until he failed to pass the final section of a polygraph dealing with data transfer. In Mr. Morter's defense, I have heard conflicting guidance on how to mark files and media coming from classified networks, particularly when dealing with the movement of commercial, UNCLASSIFIED imagery. Marking guidance was not always in writing, as the focus was on getting products out to support the mission. This could be part of Mr. Morter's difficulties, but, I can't explain why he can't set that aside to pass his polygraph. I do know that since his spouse, formerly a contractor working at USCENTCOM's "Coalition Village", had her clearance pulled for failure on multiple polygraphs, Mr. Morter's emotional reaction to polygraphs has increased significantly, particularly over the last several months as Mr. Morter has been pulled from his workspace and only given access to NIPRNET. Mrs. Morter's role involved working with Coalition representatives, and Mr. Morter, as her spouse, also attended some social events that arose because of her work. Mr. Morter told me he and his wife both reported foreign contacts. Mr. Morter freely admitted he conducted research on polygraphs even though advised against it to understand how his wife could fail. Having his clearances effectively evoked over the last four months has placed him under a lot of stress, but he has talked to a mental health specialist and is resolved to letting the process play out.

6. As Mr. Morter's direct supervisor, I would rate his work performance to be exceptional. Mr. Morter's behavior has not prompted security concerns in me or his co-workers. I don't understand why he is unable to pass the polygraphs, but, this has clearly been an emotional issue for him. He is an important asset and leader with rare scene visualization expertise to offer the command and DIA and the effects of his loss would be significant.

Encls  
2013 Civilian Evaluation  
2012 Civilian Evaluation  

Timothy Grimes  
GG-14, DIA  
Chief, GEOINT Branch  

Attachment E