Defense Intelligence Agency (DIA)
Washington, D.C. 20340

FORMAL COMPLAINT OF DISCRIMINATION

1. Full name and contact information of complainant:

   Morter, John S.
   6815 Quail Hollow Blvd.
   Wesley Chapel, FL 33544
   (813)472-9691 - home
   (813)826-1292 – work

2. DIA Office you believe discriminated against you:

   a. HQ DIA/SEC
      200 MacDill Blvd.
      Washington, DC 20340-5100
      Person I believe discriminated against me:
      Steven D. McIntosh, Insider Threat Program Coordinator

   b. HQ USSOCOM
      7701 Tampa Point Blvd.
      MacDill AFB, FL 33621
      Persons I believe discriminated against me:
      Frank M. Branch, Special Security Officer
      William D. Lanham, Chief J2X
      COL Shawn M. Nilius, Director JICSOC
      Mark Anderson, Deputy JICSOC

3. Are you now working for the Federal Service?

Yes – HQ USSOCOM, J2, JICSOC, GEOINT. 7701 Tampa Point Blvd. MacDill AFB, FL 33621.
Intelligence Analyst, GG-13

4. Name and address of your representative:

I am without representation at this point in time.

5. Date on which most recent alleged discrimination took place:

A series of events have taken place which began on 07 October 2013, when I was initially informed of the action to revoke my access to classified information and transfer me to a holding area. Adverse actions against me have continued since and have culminated in an involuntary reassignment to HQ DIA on 27 May 2014.

6. I believe that I have been discriminated against due to a MENTAL HANDICAP (Anxiety Disorder).

7. Explain how you believe you were discriminated against:

In direct violation of DoD regulations, several entities of the U.S. Government are discriminating against me because of my disability. Although I have been clinically diagnosed with a mental anxiety disorder, officials at the Defense Intelligence Agency (DIA) and HQ United States Special Operations Command (USSOCOM) have subjected me to a series of discriminatory actions that have severely impacted my employment rights and opportunities. I have had opportunities for employment obstructed, my professional advancement stagnated, my reputation damaged and have suffered severe emotional distress and mental anguish, all resulting from pernicious actions taken against me based solely on the physiological readings from a series of polygraph examinations, without any evidence of wrongdoing.

8. I have discussed my complaint with an Equal Employment Opportunity (EEO) Counselor and have filed an informal complaint in this matter. On 17 July 2014, I received a Final Interview/Notice of Right to File a Formal Discrimination Complaint, Agency Case Number: DIA-2014-00052.

9. Name of EEO Counselor:

Ms. Paris D. Nash
Complaints Program Manager
Defense Intelligence Agency (DIA)
Complaints Management Division, EO1
Equal Opportunity and Diversity Office
Comm: (202) 231-0318
DSN: 428
Fax: (202) 231-6486

10. State corrective action you are seeking.

In addition to the right to return to work at my previous place of employment, or even another position within the local commuting area, I seek an award of general damages that compensate for the harm I have suffered as a result of these discriminatory actions.

11. Have you filed a Merit Systems Protection Board Appeal or a Court Action on any issue listed in number 7 above?

No, but I have filed numerous appeals to my leadership at HQ USSOCOM and HQ DIA – all have gone unresolved.

12. Signature of complainant.

_____    23 July 2014
JOHN S. MORTER, GG-13                Date

**EEO Counselor's Report of
Informal Discrimination Complaint
29 CFR 1614.105 (c)**

**Part A-Information About Aggrieved Person:**

    **Complainant's Name**: John S. Morter

    **Place of Employment**: Defense Intelligence Agency (DIA)

        **Address**: 200 MacDill Boulevard, Building 6000, Washington, D.C., 20340

    **Employment Telephone Number**: (813) 826-1292

    **Job Title/Series/Pay Band**: GG-0132-13

    **Complainant's Home Mailing Address**: 6815 Quail Hollow Blvd Wesley Chapel, FL 33544

    **Complainant's Home Telephone Number**: (813) 472-9691

    **Complainant's E-mail Address**: John.Morter@socom.mil (work)
                                                  sammorter@gmail.com (personal)

    **Representative's Name & Address**: N/A

    **Alleged Discriminating Agency/Organization**: Defense Intelligence Agency (DIA)/Office of Security (SEC) & Special Operations Command (SOCOM)/ Joint Intelligence Center Special Operations Command (JICSOC)

**Part B-Chronology of EEO Counseling:**

    **Date of Initial Contact**: 13 June 2014
    **Date of Initial Interview**: 17 June 2014
    **Date of Most Recent Alleged Discriminatory Event(s)**: 27 May 2014
    **45th Day After Event**: 11 July 2014
    **Reason for delayed contact beyond 45 days, if applicable**: N/A
    **Date of Notice of Rights and Responsibilities**: 18 June 2014
    **Date of Final Interview**: 17 July 2014

**Part C-Basis(es) for Alleged Discrimination:**

    [ ] Race (specify):
    [ ] Color (specify):
    [ ] National Origin (specify):

[ ] Sex (specify):
[ ] Age - Date of Birth:
[X] **Mental Disability (specify):  Anxiety Disorder**
[ ] Physical Disability (specify):
[ ] Religion (specify):
[ ] PDA (Pregnancy Disability Act of 1978) (specify):
[ ] Genetic Information Non-Discrimination Act (GINA)
[ ] Retaliation (Identify earlier event(s) and/or opposed practice(s), give date(s):

**Part D-Allegation(s) of Discrimination Counseled:**

Mr. John Morter (CP) alleged discrimination on the basis of disability (anxiety disorder), when the following events occurred:

1. On 23 March 2011, Mr. Frank M. Branch, Special Security Officer (SSO), Special Operations Command (SOCOM), directed CP to undergo a DIA Counter-Intelligence (CI) Polygraph Examination, during which CP was aggressively interrogated, accused of not being truthful and suspected of withholding information. When CP returned to duty on 23 March 2011, he was informed that he would be directed to return for follow-up testing.

2. On 25 March 2011, CP informed the examiner about his concerns with one of the questions concerning the handling of classified information. The examiner rejected CP's explanation that his reactions during the previous polygraph exam were due to the confusing and controversial ways that he was required to transfer data between the Joint Worldwide Intelligence Communications Systems (JWICS) and the Secret Internet Protocol Router Network (SIPRnet) and became increasingly accusative and adamant that CP was hiding something.

3. On 31 January 2012, during the pre-test interview phase of the next polygraph examination, the examiner refused to believe CP's explanations about his concerns with the questions asked and his attempts to remain calm during the previous exam on 25 March 2011; therefore, the polygraph administrator proceeded to ask the exact same question repeatedly until finally ending the session and directing CP to return to work.

4. On/around 26 June 2012, CP was summoned for an official investigation at DIA Headquarters, conducted by two (2) investigators, to address the reasons for CP's previously failed CI Polygraph Examinations. CP was afforded the opportunity to make a sworn statement and re-take the polygraph exam once again. This session also produced false positive results due to CP's high anxiety from the previous unsuccessful attempts and his Post Traumatic Stress Disorder (PTSD) from being forcefully interrogated in the earlier sessions.

5. In October 2013, CP was notified by Mr. William D. Lanham, Chief, J2X, that SOCOM was revoking his access to the Sensitive Compartmented Information Facility (SCIF), his access to SIPRnet, and transferring him to an area outside the SCIF because he could not

pass the polygraph. SOCOM's plan was to send CP on TDY to Headquarters, DIA, so he could meet with an Agency psychologist to help him get through the polygraph.

6. On 05 November 2013, CP was directed by Mr. William Lanham, Chief, J2X, to report to Headquarters, DIA for an appointment with Dr. Kok Mum Soo-Tho, Staff Psychologist, DIA Insider Threat Mitigation Program, concerning his difficulty passing the polygraph exam. Dr. Soo-Tho determined that CP was unsuitable for additional polygraph testing because he felt that the examination had been compromised by CP during the initial session on 23 March 2011.

7. On 06 February 2014, CP received an "Advisory Letter Concerning Continued Access to Sensitive Compartmented Information," from Ms. Karen McCord, Chief, Central Adjudication Facility, due to his inability to successfully pass four (4) Counterintelligence Scope Polygraph examinations on the following dates: 23 March 2011, 25 March 2011, 31 January 2012 and 26 June 2012.

8. On 12 May 2014, CP received a verbal counseling from COL Shawn M. Nilius, Director, SOCOM/Joint Intelligence Center Special Operations Command (JICSOC), regarding the decision not to retain his employment at SOCOM or the JICSOC.

9. On 27 May 2014, CP received a Letter of Counseling from COL Shawn Nilius, Director, SOCOM as a follow-up to the verbal counseling he received on 12 May 2014, concerning the decision not to retain his employment at SOCOM.

10. On 27 May 2014, (during the same meeting as mentioned above), CP received a "Reassignment Action" memo, dated 21 May 2014, from Mr. Steven McIntosh, Insider Threat Program Coordinator, indicating that the DIA Insider Threat Program (InTP) was requesting the Office of Human Resources (OHR) to reassign him from JICSOC to DIA Headquarters, in Washington D.C.

**Part E-Remedy(ies) Requested:**

CP requested the following remedies:

1. Return to official duty position (Intelligence Officer); and
2. Suspend the pending reassignment action until the polygraph issue is resolved.

**Part F-Summary of Counselor's Inquiry:**

A. Contacts

1. **Mr. John Morter, Disability (Mental – Anxiety Disorder), Intelligence Officer, GG-0132-13, SOCOM, JICSOC, (813) 826-1292**

In a written statement, CP provided that for the past eight (8) months (October 2013 to June 2014) he has been subjected to a series of discriminatory actions that have severely impacted his employment rights and opportunities. In addition, CP provided that he believes he is being

discriminated against due to a mental disability that essentially invalidates measurements obtained through the repetitive use of the polygraph examination. CP added that his inability to perform satisfactorily on the polygraph examination is a direct result of the symptoms associated with the mental condition known as anxiety disorder, which the symptoms include motor tension, autonomic hyperactivity, apprehensive expectation, irrational fear and severe panic attacks. CP provided that he experienced severe mental anguish and emotional distress, which led him to seek mental health counseling where he was diagnosed with generalized anxiety disorder and Post Traumatic Stress Disorder (PTSD).

CP provided that he was informed that the actions to suspend his security accesses, terminate his employment at the United States Special Operations Command and force his return to Headquarters, Defense Intelligence Agency (DIA) are due to his inability to successfully pass the Counter-Intelligence (CI) Polygraph and Credibility Assessment (PCA). CP stated that DoD regulations (regulation not specified) state that PCA examinations are a supplement to, not a substitute for, other methods of screening or investigation; no unfavorable administrative action (to include access, employment, assignment, and detail determinations) shall be taken solely on the results of the polygraph examination.

CP indicated that he experienced difficulty with the polygraph examination question involving the handling of classified information, specifically, "Have you ever intentionally mishandled classified information?" According to CP, 30-40% of his duties require the transfer of classified data, in which he moves data back and forth between SIPRnet and JWICS, via a removable hard drive, DVD/CD and floppy disk.

CP stated that after being clinically diagnosed with anxiety disorder in November 2013, he received an "Advisory Letter" from DIA/Special Security Officer (SSO) in February 2014, which acknowledged his disability and ultimately authorized him to have continued access to Sensitive Compartmented Information (SCI). However, CP indicated that he was stripped of his security clearance accesses and placed in a holding status without additional corroborative evidence of wrongdoing and, as a result, he was unable to perform his job. As a result, CP provided that he received a blank mid-term assessment and is doubtful that he will receive an annual job performance appraisal. CP stated that on 12 May 2014 he was notified of his reassignment to Headquarters DIA.

CP concluded that due to the discriminating actions he has experienced his opportunities for employment have been obstructed, his capabilities for professional advancement have been wakened, his reputation has been damaged beyond repair and he has experienced extensive emotional distress and mental anguish.

CP provided supporting documentation (see Counselor's Report Attachment's 1 through 8).

2. **Mr. William Lanham**, Disability (N/A), Chief, J2X CI HUMIT, GG-0132-15, SOCOM, J2, (816) 826-1186

Mr. William Lanham was interviewed, via video teleconference, on 11 July 2014 in connection with the allegations brought forth by CP on 17 June 2014. Mr. Lanham provided that he is the Chief, J2X for SOCOM.

Mr. Lanham stated that CP was required to undergo a standard polygraph examination, in which during the first attempt in March 2011, the examiner was not able to get a baseline on CP concerning a particular question. Mr. Lanham added that during CP's second polygraph examination attempt a few days later it was discovered that CP had conducted extensive research on how to beat a polygraph exam, even when advised to cease the inappropriate action. Mr. Lanham added that when CP was initially asked if he conducted any polygraph research, his response was 'No.' Mr. Lanham stated that CP eventually confessed he had researched information concerning polygraphs, but only after he was challenged, which brought additional concerns of integrity.

According to Mr. Lanham, Lieutenant General John Mulholland, SOCOM Deputy Commander, was notified of CP's situation for situational awareness and tracking purposes. Therefore, a decision was made for Mr. Lanham to conduct a post-polygraph discussion with CP in an attempt to gain clarity on why he was not able to successfully pass the polygraph examination. Mr. Lanham explained that a common reason why individuals are not able to successfully pass polygraph exams are for reasons not associated with the question asked. For example, Mr. Lanham provided that specific polygraph questions may trigger a memory that can be embarrassing for the individual, which could potentially affect the baseline measure.

Mr. Lanham added that the individual is encouraged to clear the issue with someone who is cleared (i.e. Staff Psychologist) or an examiner. Mr. Lanham provided that he explained this procedure with CP and informed him that he was not required to disclose any personal information with him if he did not feel comfortable doing so; however, CP would need to discuss any personal concern with a professional. Mr. Lanham indicated that CP was advised to meet with Dr. Kok Mum Soo-Tho, which was a standard practice in helping individuals successfully complete and pass polygraph exams. According to Mr. Lanham, Dr. Soo-Tho reported that CP would not be able to get through another polygraph exam because he was more concerned with manipulating the exam instead of addressing the matter at issue.

Mr. Lanham stated that he was not made aware of CP's disability (anxiety disorder) until after he failed the polygraph exam (could not specify a date). In addition, Mr. Lanham provided that he was made aware that CP informed the polygraph examiner about his concerns involving transfers of classified information. Mr. Lanham stated that CP was informed that unintentional practices in accordance with agency procedures would not be counted against him, yet he was still unable to successfully pass the polygraph exam.

Mr. Lanham provided that several factors, to include CP's inability to pass several polygraph exams, SOCOM's attempts in working with CP through discussion and CP's integrity concerns led to Lieutenant General Mulholland decision to suspend CP's access pending reassignment to DIA Headquarters.

3.  **Mr. Steven McIntosh (RMO), Disability (N/A), Insider Threat Program Coordinator, SL-00 DIA, SEC, (301) 394-7038**

Mr. Steven McIntosh was interviewed, via telephone, on 11 July 2014 in connection with the allegations brought forth by CP on 17 June 2014. Mr. McIntosh provided that he is DIA's Insider Threat Program Coordinator.

Mr. McIntosh explained that the insider threat program has the responsibility to address the vulnerability of employees, to include when someone is unable to successfully pass the polygraph examination. Mr. McIntosh stated that when a DIA employee cannot complete a polygraph, it results in vulnerability concerns; therefore, it is the responsibility of DIA to review the matter of concern. Mr. McIntosh emphasized that DIA does not have the right to force another entity (i.e. SOCOM) to keep a DIA employee, specifically when they do not wish to keep the employee for security concerns. Mr. McIntosh stated that Insider Threat Mitigation Panel reviews the situation and the employee's work performance and makes a recommendation, as long as the issue remains unresolved to determine the best resolution for action. According to Mr. McIntosh, in this particular situation, the decision was made to return CP back to DIA to retain his employment and to be monitored on a closer basis.

Furthermore, Mr. McIntosh indicated that CP does not have appeal rights to the reassignment action because employees have to meet standard DIA requirements. Mr. McIntosh stated that in 2006, all DIA positions were required to undergo a polygraph examination for employment. According to Mr. McIntosh, CP has demonstrated his inability to complete the minimum requirement to successfully pass a polygraph exam; therefore, SOCOM has expressed their level of distrust and discomfort retaining CP's employment at their installation. To that end, Mr. McIntosh provided that CP will be returned back to DIA or may seek other employment options that do not require their employees to undergo a polygraph examination.

4.  **Mr. Frank Branch (RMO) Disability (N/A), Chief, Special Security Officer (SSO), GG-0080-14, SOCOM, (813) 826-4914**

Mr. Frank Branch was interviewed, via video teleconference, on 15 July 2014 in connection with the allegations brought forth by CP on 17 June 2014. Mr. Branch provided that he is the SSO for SOCOM.

Mr. Branch was asked what prompted the decision to direct CP to undergo a DIA CI polygraph examination, in which he explained that in 2008 the Combatant Command's (COCOMs) integrated with SOCOM; therefore, DIA implemented a new policy that required incoming DIA civilian employees to undergo a CI polygraph examination. Mr. Branch added that over time (2008-2009) DIA required all DIA employees to undergo a CI polygraph examination as a basic employment standard. To that end, Mr. Branch stated that SOCOM complied with DIA's policy and used a database system that would randomly select the names of DIA civilian employees for testing on an annual basis. Mr. Branch added that CP's name was randomly selected for a polygraph examination in the year 2011.

Mr. Frank stated that SOCOM's standard procedure for transferring classified data between SIPRnet and JWICS has changed several times over the years. Mr. Frank added that SOCOM had a history of transferring classified information incorrectly, which has been addressed and corrected with the use of an automated system. Mr. Frank provided that SOCOM has taken the responsibility for how classified information was being transferred, which should eliminate employees' concerns of 'intentionally' mishandling classified information.

In or around November/December 2013, Mr. Frank stated that he was informed that CP met with Dr. Kok Mum Soo-Tho, DIA Staff Psychologist, because he was having problems with successfully passing his polygraph examination due to his anxiety disorder. Mr. Frank added that at no time prior to November/December 2013 was he made aware of CP's disability. To that end, Mr. Frank stated that he was made aware that CP did not like how the polygraph examination was being conducted and became frustrated when the polygraph administrators suspected that he was withholding information.

5. **COL Shawn Nilius (RMO), Disability (N/A), Director, SOCOM, JICSOC, (813) 826-2292**

COL Shawn Nilius was interviewed, via video teleconference, on 23 July 2014 in connection with the allegations brought forth by CP on 17 June 2014. COL Nilius provided that he is the Director for SOCOM/JICSOC.

COL Nilius provided that in May 2014, he, the J2 leadership and DIA Officials met to discuss actions concerning CP's inability to successfully pass DIA's standard polygraph exam. COL Nilius stated that he concurred with Lieutenant General John Mulholland's final decision to revoke CP's SOCOM access and return him to DIA based on security concerns.

COL Nilius indicated that he was not made aware of CP's disability (anxiety disorder) until after he failed the polygraph exam on 26 June 2014 (visit to DIA Headquarters).

As it relates to CP's concerns with how he was transferring classified information, COL Nilius provided that SOCOM would take responsibility for the procedures in place concerning the transferring of classified information, which would allow CP to successful pass the polygraph question concerning mishandling of classified information. COL Nilius added he is unaware of how SOCOM employees' were trained concerning the handling of classified information; however, noted that over the years SOCOM employees have received training on how to properly transfer classified information. COL Nilius provided that on 12 May 2014, CP addressed his concerns with him and stated that he would engage IG or EO.

COL Nilius noted that CP experienced difficulty passing the same question, which appeared as if he was withholding information. COL Nilius explained that he could not confirm or deny the allegations of CP withholding information because he was not authorized to be in the room during the polygraph exam.

COL Nilius concluded that CP is a good employee with no discipline concerns; however, implied that CP is not the only employee that has not passed a polygraph exam and been held

accountable for actions. COL Nilius re-emphasized that the decision not to retain CP was made by his senior leader and he concurred with the final decision.

6. **Mr. Steven McIntosh (RMO), Disability (N/A), Insider Threat Program Coordinator, SL-00 DIA, SEC, (301) 394-7038**

Mr. Steven McIntosh was interviewed, via telephone, on 11 July 2014 in connection with the allegations brought forth by CP on 17 June 2014. Mr. McIntosh provided that he is DIA's Insider Threat Program Coordinator.

Mr. McIntosh explained that the Insider Threat Program has the responsibility to address the vulnerability of employees, to include when someone is unable to successfully pass the polygraph examination. Mr. McIntosh stated that when a DIA employee cannot complete a polygraph this causes vulnerability of concern; therefore it is the responsibility of DIA to review the matter of concern. Mr. McIntosh emphasized that DIA does not have the right to force another entity (i.e. SOCOM) to keep a DIA employee, specifically when they do not wish to keep the employee due to these security concerns. Mr. McIntosh stated that Insider Threat Mitigation Panel reviews the individual situation and the employee's work performance and makes a recommendation, as long as the issue remains unresolved, to determine the best resolution or course of action. According to Mr. McIntosh, in this particular situation, the decision was made to return CP back to DIA to retain his employment and to be monitored on a closer basis.

Furthermore, Mr. McIntosh indicated that CP does not have appeal rights to the reassignment action because employees have to meet standard DIA requirements. Mr. McIntosh stated that in 2006, all DIA positions were required to undergo a polygraph examination for employment. According to Mr. McIntosh, CP has demonstrated his inability to complete the minimum requirement to successfully pass a polygraph exam; therefore, SOCOM has expressed their level of distrust and discomfort in retaining CP as an employee at their installation. To that end, Mr. McIntosh provided that CP may return back to DIA or seek any option for employment that does not require their employees to undergo a polygraph examination.

7. **Mr. Timothy Grimes (witness), Disability (N/A), Chief, GEOINT, GG-0132-14, SOCOM, JICSOC, (813) 826-4660**

Mr. Timothy Grimes was interviewed, via video teleconference, on 11 July 2014 in connection with the allegations brought forth by CP on 17 June 2014. Mr. Grimes provided that he is CP's rater.

Mr. Grimes provided that CP informed him of his disability (anxiety disorder) in the year of 2012 after failing a polygraph exam. Mr. Grimes indicated that after CP's unsuccessful attempts to pass the polygraph exams, no actions were taken until a year in a half later when SOCOM leadership made the determination to suspend CP's security access, and then decided not to retain CP's employment. Mr. Grimes added that CP never expressed the need for a reasonable accommodation mainly because there were no issues raised until May 2014. Mr.

Grimes stated that there was nothing in CP's work performance that created concerns as to why he would not or could not pass the polygraph exam.

In addition, Mr. Grimes indicated that SOCOM's procedures for transferring classified information was not consistent, which were grounds for confusion or hesitation. He added that formal procedures for handling classified information were implemented within the past two (2) years. Mr. Grimes stated that he believed some of CP's anxiety grew from witnessing his wife fail a polygraph exam, which resulted in her termination. Mr. Grimes added that CP began conducting research on polygraphs due to his wife's termination. According to Mr. Grimes, Mr. Branch advised CP to cease his polygraph research, but CP was continued. When CP continued, after being told to stop, Mr. Branch assumed CP was trying to beat the polygraph.

Mr. Grimes concluded that the lack of feedback from leadership concerning Mr. Morter's status was extremely frustrating from a supervisory standpoint because work was neglected due to CP's inability to access SIPRnet and JWICs. In addition, Mr. Grimes provided that he feared that providing a positive performance evaluation to CP was beyond his control.

8. **Dr. Kok Mum Soo-Tho (witness), Disability (N/A), Staff Psychologist, GG-15, DIA, SEC (301) 394-7058**

Dr. Soo-Tho was interviewed, via video teleconference, on 15 July 2014 in connection with the allegations brought forth by CP on 17 June 2014. Dr. Soo-Tho provided that he is DIA's Staff Psychologist.

Dr. Soo-Tho provided that he met with CP in November 2013 to discuss his concerns and reasons for not successfully completing the administered polygraph examinations. Dr. Soo-Tho explained that additional testing is determined by an internal threat panel, giving an employee the "benefit of the doubt" and to strategize a mitigation process for the employee. Dr. Soo-Tho indicated that based on his discussion with CP he determined that CP was not suitable for additional testing when CP informed Dr. Soo-Tho of his engagement in extensive efforts to research methods on how to beat the polygraph exam. To that end, Dr. Soo-Tho provided that he reported CP's actions of research to Mr. Franck Branch for corrective actions.

Dr. Soo-Tho stated that CP informed him of his disability (anxiety disorder) and provided him with supporting medical documentation. After reviewing CP's medical documentation, Dr. Soo-Tho determined that CP's anxiety appears to be situational, specifically during a polygraph examination. Dr. Soo-Tho added that CP did not attend counseling sessions consistently, but only before or after a polygraph exam. Dr. Soo-Tho implied that CP's medical documentation did not provide an objective measure to support the diagnosis of an anxiety disorder.

9. **Mr. Scott Bixler (witness), Disability (N/A), Intelligence Officer, GG-0132-13, SOCOM, JICSOC, (813) 826-0477**

Mr. Scott Bixler was not available for an interview; therefore, he provided a written statement, via e-mail, on 18 July 2014 in connection with the allegations brought forth by CP on 17 June 2014. Mr. Bixler provided that he is CP's co-worker.

Mr. Bixler provided that he has known and worked with CP off and on since 1992, yet steadily since October 2002. Mr. Bixler stated that a duty that he and CP share is an imagery-derived process called SOFViz, in which CP served as the lead in the process.

Mr. Bixler added that at some point during the last eight (8) to nine (9) months CP was diagnosed with an anxiety disorder, which was brought to the attention of his superiors. Mr. Bixler stated that he speaks with CP almost every day, as his friend and co-worker.

Additionally, Mr. Bixler provided that the standard by which data is moved has changed a lot over the last five (5) to six (6) years. Mr. Bixler provided that he believed the J-6 Directorate at SOCOM gave the approval to move data, via removable devices. Mr. Bixler indicated that in late 2009 or early 2010, the guidance provided by SOCOM J-6 was halted and employees' were directed not to move data from the JWICS to the SIPRnet. However, a new procedure has since been implemented.

Mr. Bixler stated that there is a policy for the moving of data from JWICS to SIPRnet, which is documented for certified Internal Threat Administrator's (ITA). Mr. Bixler provided that he is not ITA certified, but was made aware that the ITA's were required to log the transfers that they completed into the directorate logging system. Mr. Bixler added that there are training requirements for moving data, in which the employee's name must be submitted by an O-6 or equivalent. According to Mr. Bixler, once an employee is approved for training, the employee is to obtain a passing training score. As a result, the employee is notified by the J-6 Directorate of his/her ability to move data between systems.

**B. Documents Reviewed but Not Attached:**

N/A

**C. Documents Attached:**

1. Equal Employment Opportunity Complaint – John S. Morter (statement), 17 June 2014
2. Advisory Letter Concerning Continued Access to Sensitive Compartmented Information, 06 February 2014
3. Reassignment Action, 21 May 2014
4. Letter of Counseling, 27 May 2014
5. Notice to Appeal, 4 June 2014
6. Receipt of Notice to Appeal, 17 June 2014
7. Memo for Record: Trip Report – DIA/SSO Questioning (statement by CP)
8. Memo for Record: My concerns with question – 'have you ever intentionally mishandled classified information?'
9. Memo for Record: Supervisor Comments concerning Mr. John "Sam" Morter, 20 February 2014
10. CP's FY 2012 Performance Evaluation
11. CP's FY 2013 Performance Evaluation
12. Notice of Rights and Responsibilities

**Part G-Summary of Informal Resolution Attempts:**

Informal resolution attempts were discussed with the appropriate management officials with authority to resolve. However, the final decision not to retain CP's employment at SOCOM was finalized by SOCOM Deputy Director, which is not appealable by DIA officials.

**Part H-If Complainant Opted For ADR, Counselor's Statement That The ADR Process Was Fully Explained To The Complainant / Summary Of The Information Given To The Complainant And The Agency By The Counselor:**

On 18 June 2014, CP was issued and explained his rights and responsibilities of the EEO complaints process. The EO Intake Counselor, Ms. Juanese Kennedy, properly explained the ADR process, as outline in the rights and responsibilities notice, in which CP accepted to participate in the ADR process. However, on 18 June 2014, CP was notified (verbally) that ADR was inappropriate with regards to the concerns he brought forth. Therefore, CP's concerns were redirected to traditional informal counseling for processing.

_[signature]_       11-10-14
Signature of EEO Counselor    Date