UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN S. MORTER,<br><br>  Plaintiff,<br><br>  v.<br><br>LLOYD J. AUSTIN III,<br><br>  Defendant. | Civil Action No. 23-343 (JEB) |

## MEMORANDUM OPINION

*Pro se* Plaintiff John S. Morter — a former employee of the Defense Intelligence Agency — has sued Secretary of Defense Lloyd J. Austin for disability discrimination. The Agency reassigned him from his post in Tampa, Florida, to its headquarters here in Washington after he failed successive, routine polygraph examinations, despite his protestations that those results were caused by his anxiety and post-traumatic stress disorder. He alleges here that the Agency violated federal anti-discrimination law by failing to accommodate his ailments, employing a policy that disparately penalizes employees with his condition, and subjecting him personally to discriminatory treatment. The Secretary now moves to dismiss, or, alternatively, for summary judgment, and Morter cross-moves for summary judgment. The Court, finding no triable issue on any count, will grant summary judgment in the Secretary's favor.

**I.   Background**

  A.   Factual Background

Because the Court is focusing on Defendant's Motion for Summary Judgment, it will construe the facts in the light most favorable to Plaintiff. See Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

1

For over a dozen years, Morter was an Intelligence Analyst for the DIA at the United States Special Operations Command (SOCOM) facility in Tampa. See ECF No. 5-2 (Def. SMF), ¶ 1; ECF No. 7-21 (Supervisor Comments), ¶ 1. As a condition of his employment there, he was required to hold a Top-Secret security clearance and handle Sensitive Compartmented Information. See Def. SMF, ¶¶ 2–3; ECF No. 7-1 (Pl. Opp.) at 2. As with all DIA employees entrusted with such information, Morter was subject to aperiodic polygraph examinations to determine whether he posed an unacceptable security risk under the Agency's Insider Threat Program. See Def. SMF, ¶ 4; ECF No. 5-5 (ITP Policy), ¶ 4.1.3; ECF No. 5-15 (Interrogatory of Steven McIntosh) at 5–6. These exams — referred to as Counterintelligence Scope Polygraphs (CSP) — measured his physiological responses under five lines of questioning, each of which could implicate a risk to national security: (1) sabotage; (2) espionage; (3) terrorism; (4) mishandling classified information; and (5) unauthorized foreign contact. See Def. SMF, ¶ 5; ECF No. 5-6 (Polygraph Policy Guidance) at 1. The examiner then issued one of the following scores: "No Deception Indicated," "No Significant Response," "No Opinion," "Significant Response," or "Deception Indicated." ECF No. 10-1 (DOD Instruction 5210.91) at 20. The last three appear to be failing scores.

Morter had, by all accounts, successfully maintained his Top-Secret clearance while working in military and civilian roles for over 30 years. See Supervisor Comments, ¶ 1. His woes began, however, on March 23, 2011, when he failed a CSP. See ECF No. 7-6 (3/23/11 CSP) at 1. Although his ratings on questions regarding sabotage, espionage, and terrorism were satisfactory, he received ratings of "No Opinion" as to his handling of classified information and foreign contacts. Id. at 1–2. Despite efforts to repeat and rephrase the questions, the "No Opinion" rating stuck. Id. at 2. Notably, in a post-test interview, Morter "expressed concerns

about issues peripheral to the security questions coupled with increasing general anxiety." Id. He agreed to return for further testing two days later, but again scored "No Opinion" on the same two topics. See Pl. Opp. at 2; Def. SMF, ¶¶ 6–7.

On January 31, 2012, Plaintiff appeared for a third CSP on all security topics. Once again, he successfully completed the test as to sabotage, espionage, and terrorism, but not as to handling classified information and foreign contacts. See ECF No. 7-9 (1/31/12 CSP) at 1. This time, he received a "Significant Response" rating on those topics. Id. at 2. Five months later, on June 26, 2012, Morter was ordered to meet with a Special Investigator at DIA Headquarters, who interviewed him on his inability to pass the CSP. See ECF No. 7-10 (DIA Report). Morter relayed to the investigator that he "became very anxious" when asked questions about mishandling classified information (but denied having ever done so intentionally) and affirmed that he "had made a conscious effort to report all unofficial foreign contacts." Id. at 2. He also signed a voluntary sworn written statement, in which he reported experiencing "nightmares about being interrogated" and feared that he was unable "to remain calm enough" to avoid a false positive. See id. at 7–9. Compounding these fears, he explained, was the experience of his wife (also a former DIA contract employee at SOCOM), who had failed a polygraph exam just two months prior to his first failed CSP and had her access to classified information revoked after "be[ing] judged by this process as a liar." Id. at 2, 7; see ECF No. 7-17 (Report on DIA Trip) at 2. Morter further disclosed that he had "conducted considerable research on the subject [of polygraph exams] and talked with dozens of people . . . in order to determine why [he was] having trouble passing." DIA Report at 7. He underwent a fourth CSP following the interview, which resulted once more in "No Opinion." Pl. Opp. at 3; Def. SMF, ¶¶ 6–7.

What came next is a matter of some dispute. The Court does not credit Plaintiff's assertion that his security clearance was revoked or that he was banished from SOCOM on October 8, 2013, see Pl. Opp. at 3, as it is not supported by any citation to the record. See Local Civ. R. 7(h); see also ECF No. 10 (Def. Reply) at 8 ("Plaintiff did not have his security clearance revoked."). Rather, it appears that the Agency — as part of an investigation into Morter's repeated CSP foibles still ongoing at that time — arranged for him to speak with an Insider Threat Program Staff Psychologist named Dr. Joe Soo-Tho "to ascertain whether there were any psychological conditions which may have impeded [his] ability to successfully complete CSP examinations" and to "identify appropriate interventions." ECF No. 5-8 (DIA Emails) at 2. That interview took place on November 6, 2013, and a report was issued the following month. See ECF No. 5-9 (Soo-Tho Report) at 1.

The significance of Dr. Soo-Tho's evaluation to the present litigation is twofold. First, it considered a record of medical care showing that Morter was diagnosed with an anxiety disorder by a psychologist, Dr. Heather Magee, who evaluated him just a few weeks prior to the interview. See Soo-Tho Report at 2; ECF No. 5-19 (Health Record) at 2; ECF No. 5-11 (11/14/13 Magee Ltr.). Morter had disclosed the visit and diagnosis to his supervisor, Timothy Grimes, for the first time on November 14, 2013, who forwarded it to the Chief of the SOCOM Special Security Office, who in turn sent it to Dr. Soo-Tho. See Pl. Opp. at 4; Soo-Tho Report at 2. Dr. Soo-Tho concluded in his report that the symptoms associated with Morter's condition "are probably easily attenuated by CSP examination procedures and should not preclude an individual's ability to successful[ly] complete" the exam. See Soo-Tho Report at 3.

Second, the report found that Morter "inadvertently revealed that he ha[d] 'done extensive research on polygraph' examinations," gave contradictory answers regarding whether

4

he "had ever looked into CSP countermeasures," and offered implausible responses regarding whether he had fully disclosed his research to the polygraph examiners. Id. Overall, Dr. Soo-Tho concluded that, given Morter's "verbalized intent and demonstrated efforts to subvert CSP examination, he is unlikely to be a suitable candidate for further polygraph testing." Id. at 4. He further determined that Morter's "lack of insight, proclivity to externalize blame and lack of candor probably limits the degree to which he may be willing and/or able to cooperate with realistic threat mitigation strategies," and noted that "[c]oordination with DIA Office of Human resources (OHR) will also likely be necessary," given SOCOM's "reluctance to permit [Morter] to remain on their premises without adequate/satisfactory resolution of" those issues. Id.

That scalding assessment did not apparently diminish Morter's standing with the DIA. On January 31, 2014, a senior adjudicator with the DIA Office of Security Investigations Division concluded that, despite his CSP results, "there is no current information provided to cast doubt on [Morter's] judgment, reliability, or trustworthiness," especially given his three decades of experience in the intelligence business. See ECF No. 7-19 (Security Review & Evaluation Record) at 1. The adjudicator's report recommended that he receive counseling for his anxiety and another CSP no sooner than six months from his last test. Id. Further, on February 6, 2014, DIA issued Morter an "Advisory Letter" regarding his continued access to classified information. See ECF No. 5-12 (Advisory Ltr.). It clarified that "[t]he decision to seek mental health care" does not "adversely impact an individual's ability to obtain or maintain a national security position," and in fact "may favorably impact" eligibility for such a position. Id. at 1. It further stated that Morter's "decision to seek mental health care and comply with treatment recommendations" were "viewed as positive signs that [he] recognized a problem existed" and

5

was "willing to take steps towards resolving" it.  Id.  The Agency determined that neither his CSP results nor his diagnosis was a ground to revoke his security clearance.  Id.

A DIA Insider Threat Mitigation Panel, nevertheless, convened on February 10, 2014, to discuss Morter's situation, and it ultimately concluded that "as an initial insider threat mitigation strategy, [he] will be returned to DIA [headquarters in Washington, D.C.] in order to discontinue the transference of risk to" SOCOM.  See DIA Emails at 7.  In Morter's defense, Grimes penned a memorandum explaining that his performance at SOCOM had been "exemplary" and free of "security incidents or issues" and that his difficulties completing the CSP were at least partially explained by his anxiety and the experiences his wife endured.  See Supervisor Comments, ¶¶ 4–5.  But that objection proved insufficient.  On May 12, 2014, Colonel Shawn Nilius — a senior official at SOCOM — verbally informed Morter that he was being reassigned to DIA headquarters.  See ECF No. 7-25 (Letter of Counseling).  Two written letters to that effect followed on May 21 and 27.  See ECF No. 5-14 (Reassignment Action Ltr.); Letter of Counseling.  The latter added that, pending completion of his reassignment, he would not have access to certain sensitive facilities at SOCOM.  See Letter of Counseling.  Contemporaneous emails show that SOCOM's deputy commander, Lieutenant General John Mulholland, had "lost confidence in Mr. Morter's ability to continue serving" there, and that his reassignment was deemed consistent with a "foundational philosoph[y]" of the DIA Insider Threat Program against "transferr[ing] risk" to other organizations.  See DIA Emails at 1, 3.

Morter appealed the decision on June 4, 2014, ultimately to no avail.  See ECF No. 5-16 (Notice to Appeal).  Stephen Norton, the DIA Director of Security who reviewed the appeal, sustained the relocation decision, which he emphasized in a later interrogatory "was based solely

on security concerns because of [Morter's] inability to complete multiple [CSP] examinations." ECF No. 5-17 (Norton Interrogatory) at 6–7.

On August 5, 2014, prior to his transfer date, Morter appeared for a fifth CSP — this time armed with diagnoses of Anxiety Disorder and Post-Traumatic Stress Disorder. See ECF No. 7-32 (8/5/14 CSP); ECF No. 7-12 (7/31/14 Diagnosis Ltr.). He nevertheless scored a "Significant Response." 8/5/14 CSP at 3. He was instructed to meet with a DIA psychologist to manage his "distraught emotional condition" in response to this latest misfire. See ECF No. 7-33 (Dr. Jill Tucillo Report) at 1. She concluded that his condition might require psychotropic medication, and that he was "not likely to be a suitable candidate for future CSP examination." Id. at 2. Two weeks later, Morter was briefly hospitalized for an acute panic attack. See Pl. Opp. at 10; ECF No. 7-35 (Hospital Discharge).

As scheduled, Plaintiff reported to DIA headquarters on August 24, 2014. Rather than assume a new position there, however, he invoked sick leave under the Family Medical Leave Act (on his doctor's advice) and returned home to Tampa. See Pl. Opp. at 10; ECF No. 5-1 (Def. MSJ) at 7 n.3.

B. Procedural Background

Plaintiff filed a formal Equal Employment Opportunity complaint on July 23, 2014. See ECF No. 7-29 (EEO Complaint). It alleged that DIA discriminated against him because of his anxiety disorder when it allegedly revoked his access to classified information in October 2013 and again when it reassigned him to DIA headquarters on May 27, 2014. Id. at 1–2. The former claim was dismissed as untimely and unreviewable. See ECF No. 5-18 (Notice of Partial Acceptance) at 3–4. After exhausting administrative remedies as to the latter claim, he filed suit in this Court on February 3, 2023, alleging a failure to accommodate his disabilities,

7

discriminatory treatment, and discriminatory impact, in violation of the Americans with Disabilities Act. See ECF No. 1 (Compl.). Secretary Austin now moves to dismiss or, in the alternative, for summary judgment, and Plaintiff cross-moves for summary judgment.

## II.     Legal Standard

As the Court decides this case under the summary-judgment standard, that is the only one it sets out here. Under Rule 56(a), summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

**III.    Analysis**

As an initial matter, the Court agrees with Defendant that the ADA does not apply to the federal government. See Def. MSJ at 1 n.1; Brown v. Paulson, 541 F. Supp. 2d 379, 382 n.1 (D.D.C. 2008). It shall, accordingly, construe *pro se* Plaintiff's claims as arising under the Rehabilitation Act of 1973, which does. Brown, 541 F. Supp. 2d at 382 n.1. The applicable legal standards do not differ between the two statutes. See Alexander v. Wash. Metro. Area Transit Auth., 826 F.3d 544, 546 (D.C. Cir. 2016).

Defendant seeks summary judgment as to Morter's failure-to-accommodate claim on various grounds, including his failure to exhaust administrative remedies. See Def. MSJ at 13–17. As to the disparate-treatment claim, the Secretary maintains that there was a legitimate, non-discriminatory reason for Morter's transfer — namely, security concerns arising from his repeated failure to complete a routine CSP. Id. at 17–21. Finally, as to his disparate-impact claim, the Secretary proposes that it may be dispensed with at this stage for want of relevant statistical evidence. Id. at 21–24. The Court addresses these contentions in turn.

   A.  Failure to Accommodate

The Rehabilitation Act requires federal employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." Minter v. Dist. of Columbia, 809 F.3d 66, 69 (D.C. Cir. 2015) (quoting 42

U.S.C. § 12112(b)(5)(A) (ADA Provision). Here, Morter alleges that permitting him to remain in his duty station at SOCOM, despite his CSP results, would have been a reasonable accommodation for his anxiety disorder. See Compl. at 2, 4. The Court agrees with the government, however, that Morter never exhausted this claim in EEO proceedings.

Before filing suit under the Rehabilitation Act, an employee must first exhaust his administrative remedies. Huang v. Wheeler, 215 F. Supp. 3d 100, 107–08 (D.D.C. 2016). "For claims against federal agencies, exhaustion requires submitting a claim to the employing agency itself." Doak v. Johnson, 798 F.3d 1096, 1099 (D.C. Cir. 2015). The employee must first "initiate contact with" an EEO Counselor "within 45 days of the date of the matter alleged to be discriminatory," and then, if that resort proves unsuccessful, file a formal administrative complaint. See 29 C.F.R. §§ 1614.105(a)(1), 1614.106.

Here, an explicit charge of failure to accommodate is absent from Morter's EEO complaint — as is any factual allegation that could be construed as a request for accommodation. See EEO Complaint at 1–2. Further, the Notice of Partial Acceptance — which details the charges that the DIA chose to investigate — shows that the Agency understood Morter's complaint to allege solely "discrimination on the basis of mental disability (anxiety disorder)" arising from three incidents: (1) on October 8, 2013, when SOCOM leadership purportedly informed him that his access to classified information was being revoked; (2) on May 12, 2014, when Colonel Nilius informed him that SOCOM would no longer retain his services; and (3) on May 27, 2014, when he received a notice of reassignment to DIA Headquarters. See Notice of Partial Acceptance at 1. There is no evidence in the record that Plaintiff ever objected to this narrow characterization of his claims. Nor does he allege in his Opposition that he did. Compare Def. MSJ at 14 (citing Notice of Partial Acceptance in support of exhaustion

10

argument), with Pl. Opp. at 10–11 (responding without disputing Notice of Partial Acceptance or specifying where in EEO complaint a failure-to-accommodate claim was raised); see also Bozgoz v. James, 2020 WL 4732085, at *7 (D.D.C. 2020) ("Since the object of the [Notice] is to summarize the issues before the agency, . . . [i]n cases where the plaintiff did not object, courts have found that the plaintiff effectively abandoned any claims that were not listed, and only the events in the Notice of Acceptance letter were administratively exhausted."); Hartzler v. Mayorkas, 2022 WL 15419995, at *9 (D.D.C. Oct. 27, 2022) (same).

Absent evidence of exhaustion, the Court has little choice but to grant summary judgment for the Secretary on this claim without delving into its merits.

B. Disparate Treatment

Next up is Morter's disparate-treatment claim, which alleges that in reassigning him to DIA Headquarters, Defendant discriminated against him on the basis of his disabilities — *i.e.*, anxiety disorder and PTSD. Before wading through the arguments and evidence on this count, a brief review of the applicable law is in order.

1. *Legal Framework*

The Supreme Court established the three-part burden-shifting framework that governs traditional claims of employment discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. In keeping with "the Supreme Court's emphasis on flexibility" in this area, our Circuit has adopted a "general version of the prima facie case requirement: the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006) (cleaned

up). After a plaintiff makes that preliminary showing, "'[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action. If the employer succeeds, then the plaintiff must 'be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext' for unlawful discrimination." Id. at 487 (quoting McDonnell Douglas, 411 U.S. at 802, 804).

When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a *prima facie* case under McDonnell Douglas." Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted). The court's task in such cases is instead to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of" a protected characteristic? Id. The "relevant inquiry" is thus whether an employee has "produced sufficient evidence for a reasonable jury to conclude that the [defendant's] asserted nondiscriminatory reason for firing h[im] was not the actual reason, and that instead the [defendant] was intentionally discriminating." Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016). The foregoing framework applies to Rehabilitation Act claims as well. Webster v. United States Dep't of Energy, 443 F. Supp. 3d 67, 80–81 (D.D.C. 2020).

Two caveats. First, the Brady "shortcut" applies only if the employer's asserted reason is supported by an "adequate evidentiary proffer." Figueroa v. Pompeo, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (cleaned up). More specifically, before advancing to the third step of the McDonnell Douglas analysis, the court must consider "(1) whether the employer has 'produced evidence that

12

a factfinder may consider at trial (or a summary judgment proceeding)'; (2) whether that evidence is sufficient to permit a reasonable jury 'to find that the employer's action was motivated by' a non-discriminatory reason; (3) whether the proffered, non-discriminatory reason is 'facially credible in light of the proffered evidence'; and (4) whether the evidence 'presents a clear and reasonably specific explanation.'" Kirkland v. McAleenan, 2019 WL 7067046, at *14 (D.D.C. Dec. 23, 2019) (quoting Figueroa, 923 F.3d at 1087–88).  A conclusory statement that the plaintiff was not qualified for the position he sought will not suffice.  Id.

Second, in assessing whether the employer's decision was animated by a discriminatory motive, courts apply a more stringent causal standard for Rehabilitation Act claims than, for example, for Title VII claims.  Whereas under Title VII "it suffices to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives," Kirkland, 2019 WL 7067046, at *15 (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 343 (2013) (cleaned up), under the Rehabilitation Act, "a plaintiff asserting a disparate treatment claim must show that the alleged discriminatory conduct was the 'but-for' cause of the asserted injury."  Id.  The Act, distinctively, "bars discrimination 'solely by reason of' the employee's protected status."  Id. (quoting 29 U.S.C. § 794(a)).

2. *Application*

Rather than quibble with the elements of Plaintiff's *prima facie* case, the Secretary contends that there was a legitimate, non-discriminatory reason for his reassignment: "[E]very available position in SOCOM required Plaintiff to be trusted with handling Top Secret and Sensitive Compartmented Information — a task that SOCOM no longer trusted Plaintiff to do — and DIA believed that it could monitor the risk posed by Plaintiff in Headquarters more effectively than if he worked elsewhere."  Def. MSJ at 19.  That rationale is more than

13

adequately borne out by the record. There is, for example, no dispute that Morter failed four CSPs prior to his reassignment. See Pl. Opp. at 2–3; Def. SMF, ¶¶ 6–7. Nor is there any dispute that, as an intelligence analyst for DIA, he was required to complete such exams under the Agency's Insider Threat Program. See Def. SMF, ¶ 4; ITP Policy, sec. 2.1; McIntosh Interrogatory at 5–6.

Multiple sources — including written interrogatories by the DIA officials who made the transfer decision — confirm that these facts and the attendant risk to national security were the reason why Morter was reassigned to DIA Headquarters. See, e.g., Reassignment Action Ltr. ("[Morter's] inability to successfully complete the counterintelligence-scope polygraph examination, which is a basic security requirement for all DIA employees, presents a security vulnerability that must be mitigated. . . . The DIA [Insider Threat Program] has determined this vulnerability can be properly mitigated by an assignment to DIA Headquarters."); DIA Emails at 7 ("[A] DIA Insider Threat Mitigation Panel . . . concurred that as an initial insider threat mitigation strategy, [Morter] will be returned to DIA HQ in order to discontinue the transference of risk to [SOCOM]."); McIntosh Interrogatory at 8–9 ("The decision to reassign Complainant to DIA Headquarters to mitigate the security vulnerability [was] due to Complainant's inability to successfully complete the CSP examination."); Norton Interrogatory at 7 ("The decision to relocate Mr. Morter was based solely on security concerns because of his inability to complete multiple [CSP] examinations and the need to mitigate these concerns.").

This evidence, in short, is sufficient for a reasonable jury to conclude that the reassignment decision was motivated by the perceived security risk associated with Plaintiff's failed polygraphs. See Figueroa, 923 F.3d at 1087. That rationale is not only "clear and reasonably specific," but it is also credible on its face, in view of Morter's undisputed CSP

14

results and the applicable DIA policies. Id. at 1087–88; cf. id. at 89 (statement that "employment decision was based on the hiring of the 'best qualified' applicant," without more, would be too "vague and slippery" to clear the second step of McDonnell Douglas) (cleaned up). Far from demonstrating that Plaintiff's mental disabilities were the sole reason for his reassignment, the foregoing evidence suggests that it was not a reason at all.

The only question now is whether Plaintiff has adduced sufficient evidence for a jury to conclude that DIA's rationale was pretextual. The Court discerns three arguments from Plaintiff on this score. First, he claims that the DIA could not honestly have believed that he was a threat to national security because he explained to them that his disabilities were the reason he flunked his CSPs. See Pl. Opp. at 13. But this is plainly not true of his PTSD diagnosis, which (as Plaintiff admits elsewhere) he provided to "[his] leadership" for the first time on July 31, 2014 — months after the transfer decision was made. Id. at 8; 7/31/14 Diagnosis Ltr.; see also Crandall v. Paralyzed Veterans of Am., 146 F.3d 894, 896–97 (D.C. Cir. 1998) (to be liable under the Rehabilitation Act, the employer must have "acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability").

As for Morter's anxiety-disorder diagnosis, the Secretary has more than adequately proven why the Agency was not convinced that it fully explained why he failed his polygraphs. The DIA tasked one of its staff psychologists, Dr. Soo-Tho, with evaluating whether "any psychological conditions . . . may have impeded" Morter's ability to successfully complete a CSP. See DIA Emails at 2. Dr. Soo-Tho interviewed Morter and reviewed his health records, including his anxiety-disorder diagnosis, but nevertheless concluded that the symptoms associated with that condition "are probably easily attenuated by CSP examination procedures

15

and should not preclude an individual's ability to successful[ly] complete" the exam.  See Soo-Tho Report at 3.

Plaintiff has not shown that this conclusion was so obviously invalid that the Agency could not honestly have believed it.  See Morris v. McCarthy, 825 F.3d 658, 671 (D.C. Cir. 2016) (explaining that the "objective validity" of employer's reason bears on whether it "honestly believed" it).  For instance, he has presented no evidence that his anxiety disorder — or PTSD, for that matter — in fact caused his prior CSP failures.  While he reported to a polygraph examiner and DIA investigator that he felt generally anxious during the exams, see, e.g., 3/23/11 CSP at 2; DIA Report at 2, he did not obtain a formal diagnosis of anxiety disorder until October 2013, after he had already failed four CSPs — failures that could have exacerbated the symptoms resulting in the anxiety-disorder diagnosis.  See Health Record at 2; Dr. Jill Tucillo Report at 1 (quoting Morter as saying that his anxiety "became severe [around October 2013] when his 'clearance was taken'") (typeface altered).

Second, Morter suggests that the Agency "blatantly violated" certain "approved and relevant regulations" by reassigning him.  See Pl. Opp. at 13.  The argument apparently adverts to regulations mentioned elsewhere in Plaintiff's Opposition brief — specifically, DOD Instruction 5210.91, Encl. 3, sec. 2(g) and Encl. 4, sec. 2(h).  There is, however, no evidence that DIA violated these regulations, so as to support an inference of pretext.  See Alford v. Def. Intel. Agency, 908 F. Supp. 2d 164, 175 (D.D.C. 2012) (acknowledging that "[i]n certain cases, an agency's failure to follow its own regulations or established procedure can provide sufficient evidence of pretext to withstand summary judgment," but finding inadequate evidence).

Section 2(g) of Enclosure 3 provides that "[n]o unfavorable administrative action (to include access, employment, assignment, and detail determinations) shall be taken solely on the

16

basis of . . . . an unresolved [personnel security screening] examination, except as provided in sections 6 and 7 of Enclosure 4." DOD Instruction 5210.91 at 10. The final clause of the rule makes clear that it is subject to "sections 6 and 7 of Enclosure 4." Section 7 provides, in part, that when DOD personnel in positions requiring security screening (including CSPs, see id. at 13) "are unable to resolve all relevant questions" of that screening, the Agency shall give that person "an opportunity to undergo additional examination," and if he fails, it may "temporarily suspend [his] access to controlled information and deny [him] assignment or detail that is contingent on such access." Id. at 21. The Agency must also advise the individual "that the [aforementioned] determination may be appealed." Id. Here, of course, Morter received multiple examinations, was reassigned after having flunked all of them, and appealed the reassignment (albeit without success).

      Likewise, there is no evidence that the Agency violated section 2(h) of Enclosure 4. That regulation requires it to establish written procedures to "[e]xempt or postpone examinations when individuals are considered medically, psychologically, or emotionally unfit to undergo an examination." Id. at 17. Here, Morter was instructed to meet with Dr. Soo-Tho to address essentially that question. See DIA Emails at 2; Soo-Tho Report at 1. Soo-Tho concluded, as already noted, that, "[f]rom a personnel security vetting perspective," his anxiety symptoms are "probably easily attenuated by CSP examination procedures" and would not preclude him from completing the exam. See Soo-Tho Report at 3. In fact, he determined that Morter was "unlikely to be a suitable candidate for further polygraph testing" only because of his "lack of candor" (and associated behavioral flaws) and alleged intent to "subvert" the exam. Id. at 4. Despite this determination, the Agency, in any event, ultimately praised Morter's willingness to seek psychological treatment, granted him another polygraph examination, and postponed the

17

date of that exam by at least six months, to allow him time to receive sufficient counseling. See Advisory Ltr. at 1; Security Review & Evaluation Record at 1; see also 8/5/14 CSP. Such measures appear to be consonant with the requirements of section 2(h).

Third, Morter accuses DIA and SOCOM of "attempt[ing] to change their reasons for punishing [him] by claiming that [he] researched the polygraph then lied about it to the agency psychologist." Pl. Opp. at 13. As a general matter, "shifting and inconsistent justifications are probative of pretext." Geleta v. Gray, 645 F.3d 408, 413 (D.C. Cir. 2011) (cleaned up). Here, however, the Agency's reason for reassigning Plaintiff has been entirely consistent: it believed, because of his failed polygraph exams, that he posed more of a security risk at SOCOM than at DIA Headquarters. See Reassignment Action Ltr.; DIA Emails at 7; McIntosh Interrogatory at 8–9; Norton Interrogatory at 7. The Agency did not cite his research into polygraphs or Soo-Tho's conclusion that he was less than forthcoming about it as a basis for reassigning him. To the extent that the Secretary highlights those facts in his Motion for Summary Judgment, the Court construes them as supporting the ultimate conclusion that Morter posed a security risk at SOCOM (rather than as a separate justification). See Def. MSJ at 19 (stating reassignment rationale that SOCOM "no longer trusted" Plaintiff with handling Top Secret and Sensitive Compartmented Information and citing the conclusions of Dr. Soo-Tho's report as supporting "contemporaneous evidence").

No reasonable jury, in sum, could find on the present record that Defendant's reason for reassigning Morter to headquarters was a pretext for disability discrimination.

C. Disparate Impact

Plaintiff's disparate-impact claim, finally, need not long detain the Court. Such a theory targets "employment practices that are facially neutral in their treatment of different groups

but . . . in fact fall more harshly on one group than another and cannot be justified by business necessity." Figueroa, 923 F.3d at 1085 (cleaned up). The employee has an initial burden to "identify the specific employment practice allegedly causing a disparate effect" and to "make a threshold showing of a significant statistical disparity caused by that practice." Id. (cleaned up). The burden then shifts to the employer to "prove the business necessity of the practice." Id. (cleaned up). Relying on statistics disclosed during discovery in his EEO proceedings, Plaintiff here alleges that 13.25% of all DIA polygraph examinations result in "No Opinion" and 5% result in "Significant Response." Pl. Opp. at 13. By his calculations, that amounts to, respectively, about 4,000 and 1,500 employees who received the same scores as he did. Id. "[Y]et there is no record," he adds, of that many people "being punished." Id. at 13–14.

        Without any evidence regarding the proportion of mentally disabled individuals (let alone those with an anxiety disorder specifically) in the Agency's employ versus the proportion of such individuals who failed the polygraph, there is little to be inferred from those figures. See, e.g., Figueroa, 923 F.3d at 1086 (comparing number of Hispanic and Latino candidates who were promoted with their proportion of the applicant pool and the overall promotion rate); see also Feloni v. Mayorkas, 2023 WL 3180313, at *7 (D.D.C. May 1, 2023) (denying motion to dismiss disparate-impact claim where plaintiff's statistics "show[ed] that female trainees fail to meet [ICE's physical-fitness] requirements at a far higher rate than do their male colleagues"). In addition, without any statistics showing that adverse actions were taken against people in Plaintiff's (still-undefined) class, no disparate impact exists. Plaintiff having made no threshold showing that a disparity exists, summary judgment for the Secretary on this count — as with the prior two — is inescapable.

19

### IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross-Motion. An Order so stating will issue this day.

/s/ *James E. Boasberg*  
JAMES E. BOASBERG  
Chief Judge

Date: February 26, 2024